UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MIDAS FUND, INC.

                Plaintiff,

    - against -

GAMMON GOLD, INC.,

                Defendants.

---

07 CV 6707

JUDGE BUCHWALD

Index No.

COMPLAINT AND DEMAND FOR JURY TRIAL

[Stamp: JUL 25 2007 U.S.D.C. S.D.N.Y. CASHIERS]

    Plaintiff, Midas Fund, Inc. ("Midas"), by and through its counsel, Guzov Ofsink, LLC, as and for its complaint against defendants Gammon Gold, Inc. ("Gammon"), alleges as follows:

### INTRODUCTION

    1.    This action arises out of fraud carried out by defendant Gammon in connection with the April 2007 sale of shares in Gammon, a mineral resource company. Both Fred George, the president of Gammon, and Russell Barwick, the CEO of Gammon, made repeated and public misrepresentations regarding the estimated production of Gammon's precious metal mines in Mexico. Based upon these misrepresentations and Midas's reasonable and justifiable reliance thereon, Midas has suffered millions of dollars in damage.

    2.    Against this factual background, Midas has no option but to bring this action for the following claims: (a) violation of Rule 10b-5 (as promulgated by the Securities and Exchange Commission pursuant to Section 10(b) of the Securities Exchange Act of 1934) (b) unjust enrichment; and (c) common law fraud; (d) negligence; and (e) Deceptive Acts and Practices under the New York Business Law.

    3.    By this complaint, Midas seeks (a) actual damages, restitution and other monetary

relief, in amounts to be determined at trial, but reasonably believed to be in excess of $3 million; (b) punitive damages, in amounts to be determined at trial, but reasonably believed to be in excess of $10 million; (c) prejudgment interest; (d) reasonable attorneys' fees and costs; and (e) such other legal and equitable relief that the Court deems just and proper.

## THE PARTIES

4. At all times hereinafter mentioned, plaintiff Midas was and is a Maryland Corporation with its principal place of business in the City of New York, County of New York.

5. Midas is a non-diversified open end management investment company which invests the majority of its assets in securities companies primarily involved, directly or indirectly, in the business of mining, processing, fabricating, distributing or otherwise dealing in gold, silver, platinum or other natural resources and in gold, silver and platinum bullion.

6. At all times hereinafter mentioned, defendant Gammon was and is a corporation organized and existing under the laws of Canada, with its principal place of business located in Halifax, Nova Scotia.

7. Gammon (formerly known as Gammon Lake Resources, Inc.) is a Nova Scotia based mid tier gold and silver production company with properties in Mexico and is listed on both the American Stock Exchange (AMEX:GRS) and on the Toronto Stock Exchange (TRX:GAM).

8. Gammon conducts and has conducted business in the State of New York, including the solicitation of plaintiff and other investors, sufficient to give rise to personal jurisdiction.

9. Fred George, who is not yet a named defendant, is an individual residing, upon information and belief, in Nova Scotia, is the president of defendant Gammon and has conducted

and conducts business in the State of New York sufficient to give rise to personal jurisdiction in this forum.

10. Russell Barwick, who is not yet a named defendant, is an individual residing, upon information and belief, in Nova Scotia, is the CEO of defendant Gammon and has conducted and conducts business in the State of New York sufficient to give rise to personal jurisdiction in this forum.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

12. This Court also has jurisdiction over plaintiff's state-law claims under the general supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) because plaintiff's state-law claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13. Judicial economy, convenience and fairness to the parties herein will result if the Court assumes and exercises jurisdiction over plaintiff's state-law claims alleged herein.

14. Federal jurisdiction is also proper under 28 U.S.C. § 1332(a)(2) because (1) the amount in controversy exceeds the sum of $75,000 and (2) plaintiff is a citizen of the state of New York and defendant is a citizen or subject of a foreign state.

## FACTUAL ALLEGATIONS

15. Midas Fund had previously made purchases of Gammon in 2004 and turned the shares for a reasonable profit.

16. Similarly, a related company, Foxby Corp., which is a non-diversified, closed-end management investment company trading on the American Stock Exchange (AMEX:FXX),

3

made investments in Gammon which likewise turned the shares for a reasonable profit.

17. During the last quarter of 2006, Gammon demonstrated impressive earnings and positive cash flow.

18. Based upon its apparent financial success, Midas Fund began investigating making a further purchase of Gammon stock.

19. An investment in a precious metal mine is not simply an investment in a commodity (*i.e.*, precious metals). Rather, it is the purchase of shares in a mining company, and, as such, its value is dependent upon a number of factors other than the market. For example, some relevant information a prudent investor would want to know is whether the company had hedged the gold price, whether the company was already producing gold or whether it was still in the exploration stages, the past amounts the mine had produced and the current production rates.

20. Thus, a prudent investor is even more dependent upon the veracity of a mining company's representations about a mines capacity and production rates, and a mining company's representatives are held to a higher degree of scrutiny.

21. In early 2007, Gammon represented that it was 100% unhedged and that its Ocampo mine in Chihuahua, Mexico, had become fully commissioned and that the company was on schedule to produce in excess of four hundred thousand (400,000) gold equivalent ounces (200,000 ounces of gold and 10 million ounces of silver) for the calendar year 2007.

22. In a January 11, 2007 press release, Gammon announced that the Ocampo mine had reached commercial production and that Gammon's combined mines (Ocampo and El Cubo mines) were producing at an "annualized production run rate of 400,000 gold equivalent ounces."

23. In a January 16, 2007 press release, Gammon announced that it had made recent discoveries of high grade gold-silver zones on multiple levels of its Ocampo mine and reiterated that Gammon was on target to produce "in excess of 400,000 gold equivalent ounces . . . per year."

24. In January 22 and 29, 2007 press releases, Gammon continued to represent that it "was on schedule to produce in excess of 400,000 gold equivalent ounces ... per year."

25. In a February 26, 2007 presentation at the BMO Capital Markets (Bank of Montreal) 16th Annual Resources Conference to potential investors, which was recorded and made available to the public as a podcast, president of Gammon, Fred George, led of his presentation with the announcement that the company was on schedule to produce 200,000 ounces of gold and 10-million ounces of silver in the calendar year 2007.

26. In the materials presented in conjunction with its February 26, 2007 presentation, the company likewise stated that it expected "full production of more than 400,000 gold equivalent ounces," that its "target production" in 2007 was 400,000 gold equivalent ounces, that its 2008 and 2009 target productions were 480,000 and 580,000 gold equivalent ounces, respectively.

27. In a March 28, 2007 press release, Gammon announced that it would be releasing its year-ending financials for 2006 On April 2, 2007 and again represented that it was on schedule to produced in excess of 400,000 gold equivalent ounces.

28. On April 2, 2007, Gammon announced that its cash flow had become positive during the last quarter of 2006 and that without regard to its latest acquisition of other mining companies, it was "targeting production of 400,000 gold equivalent ounces (200,000 ounces of gold and 10-million ounces of silver) in 2007" solely from the Company's two major mines (the

El Cubo and Ocampo mines).

29. In a press release on the following day, Gammon again maintained that it was on target to produce 400,000 gold equivalent ounces and announced the appointment of Russell Barwick as CEO and Director of the Board of Gammon.

30. On April 9, 2007, Gammon announced that it had entered into an underwriting agreement with BMO Capital Markets ("BMO") for the issuance of 10,000,000 common shares at a price of $20.00 (Canadian) per share for gross proceeds of $200,000,000.

31. As the underwriter, BMO knew or should have known that Gammon was not on schedule to produce 400,000 gold equivalent ounces in 2007 and that it was, in fact, 30% below that mark.

32. The offering was sold on a bought deal basis to a syndicate of underwriters led by BMO, Scotia Capital, Inc. and TD Securities, Inc.

33. As underwriters, Scotia Capital and TD Securities, as well as BMO, knew or should have known that Gammon's representations about its scheduled production were false.

34. Based upon its reasonable and justifiable reliance upon the representations of Gammon detailed above, which were carried out by Gammon's president and CEO and ratified by BMO and other underwriters (Scotia Bank and TD Securities), Midas invested $8,000,000 (Canadian) and purchased 400,000 shares of common shares.

35. On April 24, 2007, Gammon completed the public offering of 10,000,000 common shares.

36. In that same April 24, 2007 press release, Gammon maintained that it was on schedule to produce 400,000 gold equivalent ounces in 2007.

37. All of Gammon's representations concerning its target production were false at

the time that the representations were made.

38. Gammon's misrepresentations concerning its target production were made for the sole purpose of inducing reliance by investors in purchasing common shares in the April 2007 public offering.

39. Gammon knew or recklessly failed to discover that the production information it was presenting was incomplete and false or misleading.

40. In a May 1, 2007 press release, Gammon announced the appointment of a new CFO.

41. In that same press release, Gammon maintained that it was on schedule to produce 400,000 gold equivalent ounces in 2007.

42. However, in a May 10, 2007 press release regarding its 2007 first quarterly financial results, Gammon recanted its statements regarding its scheduled production and announced that it was "targeting a production rate of 400,000 gold equivalent ounces ... during 2007."

43. That is, in the May 10, 2007 press release, Gammon admitted that it was not on schedule to produce 400,000 gold equivalent ounces and that it had not even achieved a rate of production necessary to meet the target it had repeatedly and publicly heralded.

44. Indeed, the 2007 first quarterly financial results demonstrated that Gammon was off its alleged schedule of production by 30% and that its cash flow was negative.

45. Gammon knew that its representations were false at the time that they were made or its actions and representations were so reckless as to rise to the level of willful and wanton.

46. That is, Gammon knew or certainly should have known at the time it conducted its public offering in April 2007 that its production was well below its alleged scheduled

7

production of 400,000.

47. Indeed, prior to January 2007, Gammon issued monthly reports on its production levels, and it is beyond doubt that it knew the accurate production rate of its mines at the time it made its public offering.

48. In a January 11, 2007 press release, Gammon had announced that because the Ocampo mine had become full commissioned, it would "provide production updates in the company's quarterly Financial Statements, Management Discussions and analysis."

49. In a May 11, 2007 conference call, which was made available to the public through streaming audio over the Internet, Russell Barwick and Fred George admitted that Gammon had not even achieved a rate of production necessary to meet the alleged scheduled production for 2007.

50. Based upon the quarterly results, Gammon's scheduled production was approximately 280,000 gold equivalent ounces.

51. After the release of the first quarterly financial report and after the May 11, 2007 conference call, the price for Gammon stock fell dramatically, which resulted in the loss of millions of dollars.

52. At the time that Gammon made its repeated and public misrepresentations, all of the information necessary to determine its actual rate of production (*i.e.*, the actual take from the ore processed in the first quarter of 2007) was in its possession.

53. Therefore it is beyond doubt that the misrepresentations and omissions presented to plaintiff and to the public at large were false at the time that they were made and were such as would induce a reasonable investor to misjudge the value of common shares of Gammon.

54. Midas reasonably and justifiably relied upon Defendant's statements, which

included fraudulent misrepresentations and omitted to state material facts.

55. As a direct result, plaintiff Midas has been injured and damaged in an amount to be determined at trial, but reasonably believed to be in excess of $3 million.

56. Defendant's misrepresentations were made willfully and maliciously, and its actions were taken in willful and wanton disregard of the rights of Midas and the public at large, thus entitling Midas to an award of punitive damages.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of Rule 10b-5)

57. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 56 as if set forth fully herein.

58. As detailed above, Defendant Gammon made repeated, false and misleading statements of material fact in connection with the purchase and sale of common shares of Gammon.

59. Defendant Gammon repeatedly and publicly misrepresented that it was scheduled to produce 400,000 gold equivalent ounces in 2007 with the intent to induce investors to pay $20 (Canadian) per share for Gammon's common shares.

60. At the time Gammon made the misrepresentations, it knew that its mines were not operating at a rate of production necessary to produce 400,000 gold equivalent ounces.

61. Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omitted to state material facts.

62. As a result of Midas's reasonable and justifiable reliance on Gammon's misrepresentations, it has been damaged in an amount to be proven at trial but believed to be in excess of $3 million.

63. Defendant Gammon's conduct of intentionally or recklessly, by use of the means and instrumentalities of interstate commerce, the mails and, a national securities exchange, making untrue statements of material facts and omitting to state material facts necessary to render the statements that they did make, in light of circumstances under which they were made, not misleading constitutes violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5.

64. Defendant's misrepresentations were made willfully and maliciously, and the actions of defendant were taken in willful and wanton disregard of the rights of Midas and the public at large, thus entitling Midas to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

65. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 64 as if set forth fully herein.

66. In good faith, plaintiff Midas purchased 400,000 commons shares of Gammon for $8,000,000 (Canadian).

67. Gammon accepted the benefit of the investment.

68. By making the investment, Midas bestowed a benefit upon Defendant.

69. The Defendant obtained such benefit under false pretenses and did not adequately compensate Midas.

70. The Defendants reaped such a benefit from Midas's investment that equity and good conscience require that restitution to be made.

71. Midas has been damaged by Gammon's acts in an amount to be proven at trial but believed to be in excess of $3,000,000, plus interest.

## AS AND FOR A THIRD CAUSE OF ACTION

(Fraud)

72. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 71 as if set forth fully herein.

73. As detailed above, Defendant Gammon made repeated, false and misleading statements of material fact in connection with the purchase and sale of common shares of Gammon.

74. Defendant Gammon repeatedly and publicly misrepresented that it was scheduled to produce 400,000 gold equivalent ounces in 2007 with the intent to induce investors to pay $20 (Canadian) per share for Gammon's common shares.

75. At the time Gammon made the misrepresentations, it knew that its mines were not operating at a rate of production necessary to produce 400,000 gold equivalent ounces.

76. Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omitted to state material facts.

77. As a result of Midas's reasonable and justifiable reliance on Gammon's misrepresentations, it has been damaged in an amount to be proven at trial but believed to be in excess of $3 million.

78. Defendant's misrepresentations were made willfully and maliciously, and the actions of Defendant were taken in willful and wanton disregard of the rights of Midas and the public at large, thus entitling Midas to an award of punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
(Negligence)

79. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 78 as if set forth fully herein.

80. At all relevant times, Gammon owed Midas the highest degree of fidelity, loyalty

and fairness in their mutual dealings and had a duty to exercise reasonable care to ensure the truth, accuracy, and completeness of the representations made to Midas and the public at large.

81. The duties owed to Midas by the Defendant resulted both from their business dealings prior to the anticipated purchase of the common shares as well as their relationship resulting therefrom.

82. Defendant Gammon's duties to Midas resulted from the fact that Gammon was in a unique position to know the actual scheduled production of its own mines.

83. Defendant Gammon failed to exercise reasonable care to ensure, at all times, the complete, accurate, and truthful disclosure of material facts to Midas and the public at large.

84. Defendant Gammon made negligent representations and omissions of material fact to Midas and the public at large, including, *inter alia*, that Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007.

85. The negligent representations were incomplete, inaccurate, or untruthful.

86. Defendant, as well as its underwriters, conspired, participated in, made, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, and/or failed to prevent the acts, conduct and omissions described herein.

87. As a direct and proximate result thereof, Midas has suffered actual and consequential damages in a sum to be determined at trial believed to be in excess of $3,000,000.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Deceptive Acts and Practices
### N.Y. Business Law §§ 349 and 350)

88. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 87 as if set forth fully herein.

89. Defendant's misrepresentations, including, *inter alia*, that Gammon was

scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007, were materially misleading.

90. Defendant's misrepresentations, including, *inter alia*, that Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007, were consumer-oriented.

91. Plaintiff Midas was monetarily injured by Defendant's practices, acts and omissions.

92. By reason of the foregoing, Defendant violated N.Y. General Business Law, Article 22-A, Consumer Protection from Deceptive Acts and Practices, Sections 349 and 350.

93. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Midas has been damaged in a sum to be determined at trial believed to be in excess of $3,000,000, together with interest and attorneys' fees.

94. Defendant's conduct, as set forth above, was knowing, willful, intentional and deliberate, and involved circumstances of malice, fraud, bad faith, bad motive, circumstances of aggravation or outrage, and reckless, willful, wanton and conscious disregard or inference to Plaintiff's rights. As a result, Plaintiff is entitled to an award of treble damages in accordance with N.Y. Gen. Bus. Law § 349(h) in an exact amount to be determined at trial.

WHEREFORE, Midas Fund demands a judgment as follows:

1. On the first cause of action, damages in the amount of $3 million, punitive damages, attorney's fees, costs and interest;

2. On the second cause of action, damages in the amount of $3 million, attorney's fees, costs and interest;

3. On the third cause of action, damages in the amount of $3 million, punitive

   damages, attorney's fees, costs and interest;

4. On the fourth cause of action, damages in the amount of $3 million, attorney's fees, costs and interest;

5. On the fifth cause of action, damages in the amount of $3 million, punitive damages, attorney's fees, costs and interest; and

6. Such other and further relief as the Court may deem just and proper, including reasonable attorneys' fees and the costs and disbursements of this action.

Dated: New York, New York
       July 25, 2007

                                        GUZOV OFSINK, LLC

                                        By: _____
                                              Gregory P. Vidler (7238)
                                        *Attorneys for Plaintiff*
                                        *Midas Fund, Inc.*
                                        600 Madison Avenue, 14th Floor
                                        New York, NY 10022
                                        (212) 371-8008

## JURY TRIAL DEMAND

Plaintiff respectfully requests a jury trial for the adjudication of all claims for which a jury is available under the Seventh Amendment of the United States Constitution.

Dated: New York, New York
       July 25, 2007

                                        GUZOV OFSINK, LLC

                                        By: _____
                                              Gregory P. Vidler (7238)
                                        *Attorneys for Plaintiff*
                                        *Midas Fund, Inc.*
                                        600 Madison Avenue, 14th Floor
                                        New York, NY 10022
                                        (212) 371-8008