

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MIDAS FUND, INC.

Plaintiff,

- against -

GAMMON GOLD, INC.,

Defendants.

---

Index No.    07 CV 6707

AMENDED COMPLAINT
AND DEMAND FOR
JURY TRIAL

Plaintiff, Midas Fund, Inc. ("Midas"), by and through its counsel, Guzov Ofsink, LLC, as and for its amended complaint against defendants Gammon Gold, Inc. ("Gammon"), alleges as follows:

## INTRODUCTION

1.     This action arises out of fraud carried out by Defendant Gammon in connection with the April 2007 sale of shares in Gammon, a precious metals mining company. Both Fred George, the chairman and president of Gammon, and Russell Barwick, the CEO of Gammon, made repeated and public misrepresentations regarding the estimated production of Gammon's precious metal mines in Mexico.    Based upon these misrepresentations and Midas's reasonable and justifiable reliance thereon, Midas has suffered millions of dollars in damage.

2.     Against this factual background, Midas has no option but to bring this action for the following claims: (a) violation of Rule 10b-5 (as promulgated by the Securities and Exchange Commission pursuant to Section 10(b) of the Securities Exchange Act of 1934) (b) unjust enrichment; (c) common law fraud; (d) negligence; and (e) Deceptive Acts and

Practices under the New York Business Law.

3.      By this complaint, Midas seeks (a) actual damages, restitution, and other monetary relief, in amounts to be determined at trial, but reasonably believed to be in excess of $2.5 million; (b) punitive damages, in amounts to be determined at trial, but reasonably believed to be in excess of $10 million; (c) prejudgment interest; (d) reasonable attorneys' fees and costs; and (e) such other legal and equitable relief that the Court deems just and proper.

## THE PARTIES

4.      At all times hereinafter mentioned, Plaintiff Midas was and is a Maryland corporation with its principal place of business in the City of New York, County of New York.

5.      Midas is a non-diversified open end management investment company which invests the majority of its assets in securities of companies primarily involved, directly or indirectly, in the business of mining, processing, fabricating, distributing or otherwise dealing in gold, silver, platinum or other natural resources and in gold, silver, and platinum bullion.

6.      At all times hereinafter mentioned, Defendant Gammon was and is a corporation organized and existing under the laws of Canada, with its principal place of business located in Halifax, Nova Scotia.

7.      Defendant Gammon (formerly known as Gammon Lake Resources, Inc.) is a Nova Scotia based mid-tier precious metals mining company with properties in Mexico, which has listed its shares on both the American Stock Exchange (AMEX:GRS) and the Toronto Stock Exchange (TRX:GAM).

8.      Defendant Gammon conducts and has conducted business in the State of New

2

York, including the solicitation of Plaintiff and other investors, sufficient to give rise to personal jurisdiction.

9.     Fred George, who is not yet a named defendant, is an individual residing, upon information and belief, in Nova Scotia, is the chairman and president of Gammon and has conducted and conducts business in the State of New York sufficient to give rise to personal jurisdiction in this forum.

10.     Russell Barwick, who is not yet a named defendant, is an individual residing, upon information and belief, in Nova Scotia, is the CEO of Gammon and has conducted and conducts business in the State of New York sufficient to give rise to personal jurisdiction in this forum.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

12.     This Court also has jurisdiction over Plaintiff's state-law claims under the general supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) because Plaintiff's state-law claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.     Judicial economy, convenience and fairness to the parties herein will result if the Court assumes and exercises jurisdiction over Plaintiff's state-law claims alleged herein.

14.     Federal jurisdiction is also proper under 28 U.S.C. § 1332(a)(2) because (1) the amount in controversy exceeds the sum of $75,000 and (2) Plaintiff is a citizen of the state of New York and defendant is a citizen or subject of a foreign state.

## FACTUAL ALLEGATIONS

15.     Midas Fund had previously made purchases of Gammon shares in 2004 and sold them.

16.     During the last quarter of 2006, Defendant Gammon demonstrated impressive positive cash flow.

17.     Based upon Defendant Gammon's apparent financial success, Midas Fund began investigating making a new purchase of Gammon stock.

18.     An investment in a precious metals mining company is not simply an investment in a commodity (*i.e.*, precious metals). Rather, it is the purchase of shares in an operating company, and, as such, its value is dependent upon a number of factors other than the price of the underlying precious metals. For example, some relevant information a prudent investor would want to know is whether the company was exploring for a precious metals deposit, developing a mine, or actually producing precious metals. If the company is actually producing metal, a prudent investor would want to know what was past metal production, what is the estimate for current year production, and what was the outlook for future years' production – as significant factors used to gauge that company's likely revenue and profitability.

19.     A mine's production is usually based on a mine plan. The mine plan, based on geological, engineering, and other studies, is designed to optimize a mine's production rate given its costs and other limiting factors. When a mine is said to be "fully commissioned" it means that the mine has achieved its mine plan intended production rate.

20.     In early 2007, Defendant Gammon misrepresented that its Ocampo mine in Chihuahua, Mexico, had become "fully commissioned" and that the company was on

schedule to produce in excess of four hundred thousand (400,000) gold equivalent ounces (200,000 ounces of gold and 10 million ounces of silver) for the calendar year 2007.

21.    In a January 11, 2007 press release, Defendant Gammon announced that it "is currently producing at an annualized production run rate of 400,000 gold equivalent ounces (208,000 ounces of gold and 8.9-million ounces of silver)."

22.    In a January 16, 2007 press release, Defendant Gammon announced that it "is on schedule to produce in excess of 400,000 gold equivalent ounces (208,000 ounces of gold and 8.9-million ounces of silver) per year."

23.    In January 22 and 29, 2007 press releases, Defendant Gammon continued to knowingly misrepresent that it was on schedule to produce in excess of 400,000 gold equivalent ounces per year.

24.    In a February 26, 2007 presentation at the BMO Capital Markets (Bank of Montreal) 16th Annual Resources Conference to potential investors, which was recorded and made available to the public as a podcast, the president of Gammon, Fred George, led off his presentation with the announcement that the company was on schedule to produce 200,000 ounces of gold and 10-million ounces of silver (or together, 400,000 gold equivalent ounces) in the calendar year 2007.

25.    In the materials presented in conjunction with its February 26, 2007 presentation, the company likewise boasted that it expected "full production of more than 400,000 gold equivalent ounces," that its "target production" in 2007 was 400,000 gold equivalent ounces, and that its 2008 and 2009 target productions were 480,000 and 580,000 gold equivalent ounces, respectively.

26.    In a March 28, 2007 press release, Defendant Gammon announced that it

would be releasing its year end financials for 2006 on April 2, 2007 and stated that it "is targeting production of 400,000 gold equivalent ounces (200,000 ounces of gold and 10-million ounces of silver) in 2007."

27.     On April 2, 2007, Defendant Gammon announced that its cash flow had become positive during the last quarter of 2006 and that, without regard to its latest acquisition of other mining companies, it was "targeting production of 400,000 gold equivalent ounces (200,000 ounces of gold and 10-million ounces of silver) in 2007" solely from the Company's two major mines (the El Cubo and Ocampo mines).

28.     In a press release on the following day, Defendant Gammon again maintained that it was on target to produce 400,000 gold equivalent ounces and announced the appointment of Russell Barwick as CEO and Director of the Board of Gammon.

29.     On April 9, 2007, Defendant Gammon announced that it had entered into an underwriting agreement with BMO Capital Markets ("BMO") for the issuance of 10,000,000 common shares at a price of $20.00 (Canadian) per share for gross proceeds of $200,000,000.

30.     As the underwriter, BMO knew or should have known that Defendant Gammon was not on schedule to produce 400,000 gold equivalent ounces in 2007 and that it was, in fact, 30% below that mark.

31.     The offering was sold on a bought-deal basis to a syndicate of underwriters led by BMO, Scotia Capital, Inc. and TD Securities, Inc.

32.     As underwriters, Scotia Capital and TD Securities, as well as BMO, knew or should have known that Defendant Gammon's representations about its scheduled production were false.

33.     Based upon its reasonable and justifiable reliance upon the misrepresentations

of Defendant Gammon detailed above, which were carried out by Defendant Gammon's president and CEO and ratified by BMO and other underwriters (Scotia Bank and TD Securities), Midas invested $8,000,000 (Canadian) and purchased 400,000 shares of common shares of Gammon.

34.    On April 24, 2007, Defendant Gammon completed its public offering of 10,000,000 common shares.

35.    In that same April 24, 2007 press release, Defendant Gammon maintained that it was on schedule to produce 400,000 gold equivalent ounces in 2007.

36.    All of Defendant Gammon's representations concerning its 2007 production were false at the time the representations were made.

37.    Defendant Gammon's misrepresentations concerning its 2007 production were made for the sole purpose of inducing reliance by investors in purchasing common shares in the April 2007 public offering.

38.    Defendant Gammon knew or recklessly failed to discover that the production information it was presenting was incomplete and false or misleading.

39.    In a May 1, 2007 press release, Defendant Gammon announced the appointment of a new CFO.

40.    In that same May 1, 2007 press release, Defendant Gammon maintained that it was on schedule to produce 400,000 gold equivalent ounces in 2007.

41.    Sixteen days after it completed its sale of shares to the public, however, in a May 10, 2007 press release regarding its 2007 first quarterly financial results, Defendant Gammon recanted its statements regarding its 2007 production of 400,000 gold equivalent ounces. Without elaboration, it simply announced that it was "targeting a production **rate** of

400,000 gold equivalent ounces ... during 2007." [emphasis added] By adding the word "rate," Gammon indicated it was no longer targeting 2007 production of 400,000 gold equivalent ounces.

42.    That is, in the May 10, 2007 press release, not only did Defendant Gammon admit that it was not on schedule to produce 400,000 gold equivalent ounces by the end of 2007, but further, that it had not yet even achieved a rate of production necessary to meet the target it had repeatedly and publicly heralded.

43.    Indeed, the 2007 first quarterly operational results demonstrated that Defendant Gammon was off its alleged schedule of 2007 production by 30% (or approximately 120,000 gold equivalent ounces). Its cash flow had also inexplicably turned back negative in the first quarter.

44.    Defendant Gammon knew that its representations were false at the time that they were made or its actions and misrepresentations were so reckless as to rise to the level of willful and wanton.

45.    That is, Defendant Gammon knew or certainly should have known at the time it conducted its public offering in April 2007 that its production was well below its alleged scheduled production of 400,000 gold equivalent ounces.

46.    Indeed, prior to January 2007, Defendant Gammon issued monthly reports on its production levels, and it is beyond doubt that it knew the accurate production rate of its mines at the time it made its public offering.

47.    In a January 11, 2007 press release, Defendant Gammon announced that because the Ocampo mine had become full commissioned, it would "provide production updates in the company's quarterly Financial Statements, Management Discussions and

Analysis."

48.     In a May 11, 2007 conference call, which was made available to the public through streaming audio over the Internet, Russell Barwick and Fred George admitted that Defendant Gammon had not even achieved a rate of production necessary to meet the exaggerated scheduled production for 2007.

49.     Annualizing the first quarter's results, Defendant Gammon is scheduled to produce approximately 280,000 gold equivalent ounces for 2007.

50.     After the release of the first quarterly report and after the May 11, 2007 conference call, the price for Gammon stock fell dramatically, which resulted in Midas's loss of millions of dollars.

51.     At the time that Defendant Gammon made its repeated and public misrepresentations, all of the information necessary to determine its actual rate of production (*i.e.*, the actual take from the ore processed in the first quarter of 2007) was in its possession.

52.     Therefore, it is beyond doubt that the misrepresentations and omissions presented to Plaintiff and to the public at large were false at the time that they were made and were made to induce Midas and other reasonable investors to misjudge the value of common shares of Gammon.

53.     Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omitted to state material facts.

54.     As a direct result, Plaintiff Midas has been injured and damaged in an amount to be determined at trial but reasonably believed to be in excess of $2.5 million.

55.     Defendant's misrepresentations were made willfully and maliciously, and its actions were taken in willful and wanton disregard of the rights of Midas and other reasonable

investors, thus entitling Midas to an award of punitive damages.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of Rule 10b-5)

56.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 55 as if set forth fully herein.

57.     As detailed above, Defendant Gammon made repeated false and misleading statements and omissions of material facts in connection with the purchase and sale of common shares of Gammon.

58.     Defendant Gammon repeatedly and publicly misrepresented that it was scheduled to produce 400,000 gold equivalent ounces in 2007 with the intent to induce Midas and other reasonable investors to pay $20 (Canadian) per share for Gammon's common shares.

59.     At the time Defendant Gammon made the misrepresentations, it knew that its mines were not operating at a rate of production necessary to produce 400,000 gold equivalent ounces in 2007.

60.     Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omitted to state material facts.

61.     As a result of Midas's reasonable and justifiable reliance on Defendant Gammon's misrepresentations, it has been damaged in an amount to be proven at trial but believed to be in excess of $2.5 million.

62.     Defendant Gammon's conduct of intentionally or recklessly, by use of the means and instrumentalities of interstate commerce, the mails and, a national securities exchange, making untrue statements of material facts and omitting to state material facts necessary to render the statements that they did make, in light of circumstances under which

they were made, not misleading constitutes violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5.

63.    Defendant's misrepresentations were made willfully and maliciously, and the actions of defendant were taken in willful and wanton disregard of the rights of Midas and other reasonable investors, thus entitling Midas to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

64.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 63 as if set forth fully herein.

65.    In good faith, Plaintiff Midas purchased 400,000 commons shares of Gammon for $8,000,000 (Canadian).

66.    Defendant Gammon accepted the benefit of the investment.

67.    By making the investment, Midas bestowed a benefit upon Defendant.

68.    The Defendant obtained such benefit under false pretenses and did not adequately compensate Midas.

69.    The Defendants reaped such a benefit from Midas's investment that equity and good conscience require that restitution to be made.

70.    Midas has been damaged by Defendant Gammon's acts in an amount to be proven at trial but believed to be in excess of $2,5 million, plus interest.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Fraud)

71.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 70 as if set forth fully herein.

72.     As detailed above, Defendant Gammon made repeated, false and misleading statements and omissions of material fact in connection with the purchase and sale of common shares of Gammon.

73.     Defendant Gammon repeatedly and publicly misrepresented that it was scheduled to produce 400,000 gold equivalent ounces in 2007 with the intent to induce investors to pay $20 (Canadian) per share for Gammon's common shares.

74.     At the time Defendant Gammon made the misrepresentations, it knew that its mines were not operating at a rate of production necessary to produce 400,000 gold equivalent ounces.

75.     Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omissions of material facts.

76.     As a result of Midas's reasonable and justifiable reliance on Defendant Gammon's misrepresentations, it has been damaged in an amount to be proven at trial but believed to be in excess of $2.5 million.

77.     Defendant's misrepresentations were made willfully and maliciously, and the actions of Defendant were taken in willful and wanton disregard of the rights of Midas and , thus entitling Midas to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Negligence)

78.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 77 as if set forth fully herein.

79.     At all relevant times, Defendant Gammon owed Midas the highest degree of fidelity, loyalty, and fairness in their mutual dealings and had a duty to exercise reasonable care to ensure the truth, accuracy, and completeness of the representations made to Midas and

other reasonable investors.

80.     The duties owed to Midas by the Defendant resulted both from their business dealings prior to the anticipated purchase of the common shares as well as their relationship resulting therefrom.

81.     Defendant Gammon's duties to Midas resulted from the fact that Defendant Gammon was in a unique position to know the actual scheduled production of its own mines.

82.     Defendant Gammon failed to exercise reasonable care to ensure, at all times, the complete, accurate, and truthful disclosure of material facts to Midas and other reasonable investors.

83.     Defendant Gammon made negligent misrepresentations and omissions of material fact to Midas and the public at large, including, *inter alia*, that Defendant Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007.

84.     The negligent misrepresentations were incomplete, inaccurate, or untruthful.

85.     Defendant, as well as its underwriters, conspired, participated in, made, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, and/or failed to prevent the acts, conduct, and omissions described herein.

86.     As a direct and proximate result thereof, Midas has suffered actual and consequential damages in a sum to be determined at trial believed to be in excess of $2,500,000.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Deceptive Acts and Practices
### N.Y. Business Law §§ 349 and 350)

87.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 86 as if set forth fully herein.

88.     Defendant's misrepresentations, including, *inter alia*, that Defendant Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007, were materially misleading.

89.     Defendant's misrepresentations, including, *inter alia*, that Defendant Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007, were consumer-oriented.

90.     Plaintiff Midas was monetarily injured by Defendant's practices, acts, and omissions.

91.     By reason of the foregoing, Defendant violated N.Y. General Business Law, Article 22-A, Consumer Protection from Deceptive Acts and Practices, Sections 349 and 350.

92.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Midas has been damaged in a sum to be determined at trial believed to be in excess of $2,500,000, together with interest and attorneys' fees.

93.     Defendant's conduct, as set forth above, was knowing, willful, intentional, and deliberate, and involved circumstances of malice, fraud, bad faith, bad motive, circumstances of aggravation or outrage, and reckless, willful, wanton, and conscious disregard or inference to Plaintiff's rights.   As a result, Plaintiff is entitled to an award of treble damages in accordance with N.Y. Gen. Bus. Law § 349(h) in an exact amount to be determined at trial.

WHEREFORE, Midas Fund demands a judgment as follows:

1.  On the first cause of action, damages in the amount of at least $2.5 million, punitive damages, attorney's fees, costs and interest;

2.  On the second cause of action, damages in the amount of at least $2.5 million, attorney's fees, costs and interest;

14

3. On the third cause of action, damages in the amount of at least $2.5 million, punitive damages, attorney's fees, costs and interest;

4. On the fourth cause of action, damages in the amount of $2.5 million, attorney's fees, costs and interest;

5. On the fifth cause of action, damages in the amount of $2.5 million, punitive damages, attorney's fees, costs and interest; and

6. Such other and further relief as the Court may deem just and proper, including reasonable attorneys' fees and the costs and disbursements of this action.

Dated: New York, New York
     August 6, 2007

               GUZOV OFSINK, LLC

               By: _____
                     Gregory P. Vidler (7238)
               *Attorneys for Plaintiff*
               *Midas Fund, Inc.*
               600 Madison Avenue, 14th Floor
               New York, NY 10022
               (212) 371-8008

**JURY TRIAL DEMAND**

Plaintiff respectfully requests a jury trial for the adjudication of all claims for which a

jury is available under the Seventh Amendment of the United States Constitution.


Dated:  New York, New York
        August 6, 2007

GUZOV OFSINK, LLC


By: _____
      Gregory P. Vidler (7238)
*Attorneys for Plaintiff*
*Midas Fund, Inc.*
600 Madison Avenue, 14th Floor
New York, NY 10022
(212) 371-8008