UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIDAS FUND, INC.

    Plaintiff,

- against -

GAMMON GOLD, INC., FRED GEORGE, BRADLEY LANGILLE, RUSSELL BARWICK, COLIN SUTHERLAND, BMO NESBITT BURNS INC., SCOTIA CAPITAL INC., and TD SECURITIES INC.,

    Defendants.

Index No.    07 CV 6707 (NRB)

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



RECEIVED
OCT 12 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, Midas Fund, Inc. ("Midas"), by and through its counsel, Guzov Ofsink, LLC, as and for its amended complaint against defendants Gammon Gold, Inc. ("Gammon"), Fred George ("George"), Bradley Langille ("Langille"), Russell Barwick ("Barwick"), Colin Sutherland ("Sutherland") (George, Langille, Barwick and Sutherland collectively referred to as "Individual Defendants"), BMO Nesbitt Burns Inc. ("BMO"), Scotia Capital Inc. ("Scotia") and TD Securities Inc. ("TD")(BMO, Scotia and TD collectively referred to as "Underwriter Defendants") alleges as follows:

## INTRODUCTION

1.    This action arises out of fraud carried out by Defendant Gammon, the Individual Defendants and Underwriter Defendants in connection with the April 2007 sale of shares in Gammon, a precious metals mining company. Both George, the chairman and president of Gammon, and Barwick, the then CEO of Gammon, made repeated public misrepresentations regarding the production and estimated production of Gammon's precious metal mines in Mexico. Based upon these misrepresentations and Midas's reasonable and

justifiable reliance thereon, Midas has suffered millions of dollars in damage.

2.    Against this factual background, Midas has no option but to bring this action for the following claims: (a) violation of Rule 10b-5 (as promulgated by the Securities and Exchange Commission pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "34 Act")); (b) violation of sections 11 and 12 of the Securities Act of 1933 (the "33 Act"); (c) control person liability pursuant to section 20 of the 34 Act; (d) unjust enrichment; (e) common law fraud; (f) negligence; and (g) Deceptive Acts and Practices under the New York Business Law.

3.    By this complaint, Midas seeks (a) actual damages, restitution, and other monetary relief, in amounts to be determined at trial, but reasonably believed to be in excess of $2.4 million; (b) punitive damages, in amounts to be determined at trial, but reasonably believed to be in excess of $10 million; (c) prejudgment interest; (d) reasonable attorneys' fees and costs; and (e) such other legal and equitable relief that the Court deems just and proper.

**THE PARTIES**

4.    At all times hereinafter mentioned, Plaintiff Midas was and is a Maryland corporation with its principal place of business in the City of New York, County of New York.

5.    Midas is a non-diversified open end management investment company which invests the majority of its assets in securities of companies primarily involved, directly or indirectly, in the business of mining, processing, fabricating, distributing or otherwise dealing in gold, silver, platinum or other natural resources and in gold, silver, and platinum bullion.

6.    At all times hereinafter mentioned, Defendant Gammon was and is a

3

corporation organized and existing under the laws of Canada, with its principal place of business located in Halifax, Nova Scotia.

7.     Defendant Gammon (formerly known as Gammon Lake Resources, Inc.) is a Nova Scotia based mid-tier precious metals mining company with properties in Mexico and has listed its shares on both the American Stock Exchange (AMEX:GRS) and the Toronto Stock Exchange (TRX:GAM).

8.     At all times relevant to this action, Defendant Fred George, an individual residing, upon information and belief, in Nova Scotia, was the chairman of the board of directors and president of Gammon.

9.     Defendant Fred George was and is involved in the day to day operations of Defendant Gammon, controls and controlled, at least in part, the decision-making of Defendant Gammon and had control over the content of the various false press releases and statements alleged herein.

10.    Defendant Russell Barwick, an individual residing, upon information and belief, in Nova Scotia, was the CEO of Gammon from April 3 to September 24, 2007, and was a director of Gammon at all times relevant to this action.

11.    Defendant Barwick was and is involved in the day to day operations of Defendant Gammon, controls and controlled, at least in part, the decision-making of Defendant Gammon and had control over the content of the various false press releases and statements alleged herein.

12.    At all times relevant to this action, Defendant Bradley Langille was an individual residing, upon information and belief, in Nova Scotia, was a director of Gammon, and was, until April 3, 2007, the CEO of Gammon.

4

13.    Defendant Langille was and is involved in the day to day operations of Defendant Gammon, controls and controlled, at least in part, the decision-making of Defendant Gammon and had control over the content of the various false press releases and statements alleged herein.

14.    At all times relevant to this action, Defendant Colin Sutherland was an individual residing, upon information and belief, in Nova Scotia, was a director of Gammon and was, until May 16, 2007, the CFO of Gammon.

15.    Defendant Sutherland was and is involved in the day to day operations of Defendant Gammon, controls and controlled, at least in part, the decision-making of Defendant Gammon and had control over the content of the various false press releases and statements alleged herein.

16.    Defendant BMO is a corporation organized and existing under the laws of Canada with its principal office in Toronto, Ontario.  BMO maintains a branch office within the State of New York at 3 Times Square, New York, NY 10036.

17.    Defendant TD is a corporation organized, upon information and belief, under the laws of Canada.  TD maintains a branch office within the State of New York at 31 W. 52nd St, New York, NY 10019.

18.    Defendant Scotia is a corporation organized, on information and belief, under the laws of Canada.  Scotia maintains a branch office at One Liberty Plaza, 165 Broadway, New York, NY 10006.

**JURISDICTION AND VENUE**

19.    This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

20.     This Court also has jurisdiction over Plaintiff's state-law claims under the general supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) because Plaintiff's state-law claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

21.     Judicial economy, convenience, and fairness to the parties herein will result if the Court assumes and exercises jurisdiction over Plaintiff's state-law claims alleged herein.

22.     Federal jurisdiction is also proper under 28 U.S.C. § 1332(a)(2) because (1) the amount in controversy exceeds the sum of $75,000 and (2) Plaintiff is a citizen of the state of New York and each defendant is a citizen or subject of a foreign state.

23.     Defendant Gammon conducts and has conducted business in the State of New York, including the solicitation of Plaintiff and other investors for the transaction at issue in this litigation, sufficient to give rise to personal jurisdiction pursuant to NY CPLR 301 and/or 302(a)(1).

24.     Each of the Individual Defendants is subject to personal jurisdiction pursuant to NY CPLR 302(a)(3)(i) and (ii), in that they each committed tortious acts outside the State of New York giving rise to this action and causing damage within the state and engaged in a persistent course of conduct and/or derived substantial revenue from services rendered in the state, or expected or should have expected the tortious acts to have consequences in the state and derived substantial revenue from international commerce.

25.     In addition, personal jurisdiction exists with respect to Defendant George pursuant to CPLR 302(a)(2), in that he committed tortious acts within New York giving rise to this action.

26.     Defendant BMO maintains a branch office at 3 Times Square, New York, NY 10036, and is therefore physically present within the state of New York, giving rise to personal jurisdiction pursuant to CPLR 301. In the alternative, Defendant BMO is subject to personal jurisdiction pursuant to NY CPLR 302(a)(3)(i) and (ii), in that it committed tortious acts outside the State of New York giving rise to this action and causing damage within the state and engaged in a persistent course of conduct and/or derived substantial revenue from services rendered in the state, or expected or should have expected the tortious acts to have consequences in the state and derived substantial revenue from international commerce.

27.     Defendant TD maintains a branch office at 31 West 52nd St, New York, NY 10019, and is therefore physically present within the state of New York, giving rise to personal jurisdiction pursuant to CPLR 301. In the alternative, TD is subject to personal jurisdiction pursuant to CPLR 302(a)(3)(i) and (ii), in that it committed tortious acts outside the State of New York giving rise to this action and causing damage within the state and engaged in a persistent course of conduct and/or derived substantial revenue from services rendered in the state, or expected or should have expected the tortious acts to have consequences in the state and derived substantial revenue from international commerce.

28.     Defendant Scotia is present within the state of New York, giving rise to personal jurisdiction pursuant to CPLR 301. In the alternative, Scotia is subject to personal jurisdiction pursuant to CPLR 302(a)(3)(i) and (ii), in that it committed tortious acts outside the State of New York giving rise to this action and causing damage within the state and engaged in a persistent course of conduct and/or derived substantial revenue from services rendered in the state, or expected or should have expected the tortious acts to have consequences in the state and derived substantial revenue from international commerce.

**FACTUAL ALLEGATIONS**

29.    Midas Fund had previously made purchases of Gammon shares in 2004 and sold them.

30.    An investment in a precious metals mining company is not simply an investment in a commodity (*i.e.*, precious metals). Rather, it is the purchase of shares in an operating company, and, as such, its value is dependent upon a number of factors other than the price of the underlying precious metals. For example, some relevant information a reasonable investor would want to know is whether the company was exploring for a precious metals deposit, developing a mine, or actually producing precious metals. If the company is actually producing metal, a reasonable investor would want to know the past metal production, the estimate for current year production, and the outlook for future years' production as significant factors used to gauge the company's likely revenue and profitability.

31.    A mine's production is usually based on a mine plan. The mine plan, based on geological, engineering, and other studies, is designed to optimize a mine's production rate given its costs and other limiting factors. When a mine is said to be "fully commissioned," it means that the mine has achieved its mine plan intended production rate.

32.    In early 2007, Defendant Gammon misrepresented that its Ocampo mine in Chihuahua, Mexico, had become "fully commissioned" and that the company was on schedule to produce in excess of four hundred thousand (400,000) gold equivalent ounces (200,000 ounces of gold and 10 million ounces of silver) for the calendar year 2007.

33.    In a January 11, 2007 press release, Defendant Gammon announced that it "*is currently producing* at an annualized production run rate of 400,000 gold equivalent ounces (208,000 ounces of gold and 8.9-million ounces of silver)." (Emphasis added).

8

34.    In a January 16, 2007 press release, Defendant Gammon announced that it "is on schedule to produce in excess of 400,000 gold equivalent ounces (208,000 ounces of gold and 8.9-million ounces of silver) per year."

35.    In January 22 and 29, 2007 press releases, Defendant Gammon continued knowingly to misrepresent that it was on schedule to produce in excess of 400,000 gold equivalent ounces per year.

36.    In a February 26, 2007 presentation at the BMO Capital Markets (Bank of Montreal) 16th Annual Resources Conference to potential investors, which was recorded and made available to the public as a podcast, the president of Gammon, Defendant Fred George, led off his presentation with the announcement that the company was on schedule to produce 200,000 ounces of gold and 10-million ounces of silver (or together, 400,000 gold equivalent ounces) in the calendar year 2007.

37.    In the materials presented in conjunction with its February 26, 2007 presentation, the company likewise boasted that it expected "full production of more than 400,000 gold equivalent ounces," that its "target production" in 2007 was 400,000 gold equivalent ounces, and that its 2008 and 2009 target productions were 480,000 and 580,000 gold equivalent ounces, respectively.

38.    In a March 28, 2007 press release, Defendant Gammon announced that it would be releasing its year end financials for 2006 on April 2, 2007 and stated that it "is targeting production of 400,000 gold equivalent ounces (200,000 ounces of gold and 10-million ounces of silver) in 2007."

39.    On April 2, 2007, Defendant Gammon announced that its cash flow had become positive during the last quarter of 2006 and that, without regard to its possible

acquisitions of other mining companies, it was "targeting production of 400,000 gold equivalent ounces (200,000 ounces of gold and 10-million ounces of silver) in 2007" solely from the Company's two major mines (the El Cubo and Ocampo mines).

40.     In a press release on the following day, Defendant Gammon again maintained that it was on target to produce 400,000 gold equivalent ounces and announced the appointment of Russell Barwick as CEO and Director of the Board of Gammon.

41.     On April 9, 2007, Defendant Gammon announced that it had entered into an underwriting agreement with the Underwriter Defendants for the issuance of 10,000,000 common shares at a price of $20.00 (Canadian) per share for gross proceeds of $200,000,000.

42.     The Underwriter Defendants, through their required due diligence into Gammon, knew or should have known that Defendant Gammon was not on schedule to produce 400,000 gold equivalent ounces in 2007 and that it was, in fact, 30% below that mark.

43.     The offering was sold on a bought-deal basis to a syndicate of underwriters led by the Underwriter Defendants .

44.     The Underwriter Defendants, through their required due diligence into Gammon, knew or should have known that Defendant Gammon's representations about its scheduled production were false.

45.     Gammon's stock offering was marketed to potential investors, including Midas, through a registration statement and short-form prospectus which were filed with the SEC on or around April 9, 2007, and subsequently amended on or around April 9, 2007 and April 11, 2007 (as amended, the "Registration Statement").

46.     The Registration Statement incorporates by reference each of the press releases

referred to in paragraphs 33, 34, 35, 39 and 40, above.

47.     Each of the Individual Defendants signed the Registration Statement. Further, each of the Individual Defendants, by virtue of their status as senior officers and/or directors of Gammon, had the authority and opportunity to review the Registration Statement for accuracy and completeness prior to its filing, and could have corrected any inaccurate or misleading statements in the Registration Statement prior to its dissemination to the public, but chose not to so.

48.     Based upon its reasonable and justifiable reliance upon the misrepresentations of Defendant Gammon detailed above, which were carried out by Defendants Barwick and George and ratified by Defendants Langille, Sutherland, and the Underwriter Defendants, Midas invested $8,000,000 (Canadian) and purchased 400,000 shares of common shares of Gammon.

49.     On April 24, 2007, Defendant Gammon completed its public offering of 10,000,000 common shares.

50.     In that same April 24, 2007 press release, Defendant Gammon maintained that it was on schedule to produce 400,000 gold equivalent ounces in 2007.

51.     All of Defendant Gammon's representations concerning its 2007 production were false at the time the representations were made.

52.     Defendant Gammon's misrepresentations concerning its 2007 production were made for the sole purpose of inducing reliance by investors in purchasing common shares in the April 2007 public offering.

53.     Defendant Gammon knew or recklessly failed to discover that the production information it was presenting was incomplete and false or misleading.

54.    In a May 1, 2007 press release, Defendant Gammon announced the appointment of a new CFO.

55.    In that same May 1, 2007 press release, Defendant Gammon maintained that it was on schedule to produce 400,000 gold equivalent ounces in 2007.

56.    Only sixteen days after it completed its sale of shares to the public, however, in a May 10, 2007 press release regarding its 2007 first quarter financial results, Defendant Gammon recanted its statements regarding its 2007 production of 400,000 gold equivalent ounces. Without elaboration, it simply announced that it was "targeting a production **rate** of 400,000 gold equivalent ounces ... during 2007." [emphasis added] By adding the word "rate," Gammon indicated it was no longer targeting 2007 production of 400,000 gold equivalent ounces.

57.    That is, in the May 10, 2007 press release, not only did Defendant Gammon admit that it was not on schedule to produce 400,000 gold equivalent ounces by the end of 2007, but further, that, notwithstanding its January 11, 2007 press release, it had not yet even achieved a rate of production necessary to meet the target it had repeatedly and publicly heralded.

58.    Indeed, the 2007 first quarterly operational results demonstrated that Defendant Gammon was off its alleged schedule of 2007 production by 30% (or approximately 120,000 gold equivalent ounces). Its cash flow had also inexplicably turned back negative in the first quarter.

59.    Defendant Gammon knew that its representations were false at the time that they were made or its actions and misrepresentations were so reckless as to rise to the level of willful and wanton.

60.    That is, Defendant Gammon knew or certainly should have known at the time it conducted its public offering in April 2007 that its production was well below its alleged scheduled production of 400,000 gold equivalent ounces.

61.    Indeed, prior to January 2007, Defendant Gammon issued monthly reports on its production levels, and it is beyond doubt that it knew the accurate production rate of its mines at the time it made its public offering.

62.    In a January 11, 2007 press release, Defendant Gammon announced that because the Ocampo mine had become fully commissioned, it would "provide production updates in the company's quarterly Financial Statements, Management Discussions and Analysis."

63.    In a May 11, 2007 conference call, which was made available to the public through streaming audio over the Internet, Russell Barwick and Fred George admitted that Defendant Gammon had not even achieved a rate of production necessary to meet the exaggerated scheduled production for 2007, although Gammon had claimed to have already reached that rate in January of 2007.

64.    Annualizing the first quarter's results, Defendant Gammon is scheduled to produce approximately 280,000 gold equivalent ounces for 2007.

65.    After the release of the first quarterly report and after the May 11, 2007 conference call, the price for Gammon stock fell dramatically, which resulted in Midas's loss of millions of dollars.

66.    At the time that Defendant Gammon made its repeated and public misrepresentations, all of the information necessary to determine its actual rate of production (i.e., the actual take from the ore processed in the first quarter of 2007) was in its possession.

67.    Therefore, it is beyond doubt that the misrepresentations and omissions presented to Plaintiff and to the public at large were false at the time that they were made and were made to induce Midas and other reasonable investors to misjudge the value of common shares of Gammon.

68.    On August 3, 2007, Defendant Fred George admitted to the media that Gammon had experienced a production shortfall due to "unexpected equipment problems," though he did not explain why Gammon failed to alert its investors to this known shortfall in production.

69.    Each of the Individual Defendants have received substantial increases to their compensation packages over the past several years.    For example, George's current employment contract guarantees him a salary of $1 million per year, an increase of approximately $400,000 over his 2006 salary, and of approximately $850,000 over his 2005 salary.    Sutherland, Langille, and (upon information and belief) Barwick have received similar increases to their compensation over the same time frame.

70.    Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omitted to state material facts.

71.    As a direct result, Plaintiff Midas has been injured and damaged in an amount to be determined at trial but reasonably believed to be in excess of $2.4 million.

72.    Defendant's misrepresentations were made willfully and maliciously, and its actions were taken in willful and wanton disregard of the rights of Midas and other reasonable investors, thus entitling Midas to an award of punitive damages.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of Section 10b of the 34 Act and Rule 10b-5)
### (As Against Gammon and the Individual Defendants)

73.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 72 as if set forth in full herein.

74.    As detailed above, Defendant Gammon made repeated false and misleading statements and omissions of material facts in connection with the purchase and sale of common shares of Gammon.

75.    Defendant Gammon repeatedly and publicly misrepresented that it had achieved an annualized run rate of 400,000 gold equivalent ounces in January of 2007 and that it was scheduled to produce in excess of 400,000 gold equivalent ounces in 2007 with the intent to induce Midas and other reasonable investors to pay $20 (Canadian) per share for Gammon's common shares.   Defendant George reiterated this misrepresentation during the February 26, 2007 presentation to the BMO 16th Annual Resources Conference.

76.    At the time Defendants Gammon and George made the misrepresentations, they knew that Gammon's mines were not operating at a rate of production necessary to produce 400,000 gold equivalent ounces in 2007.

77.    Each of the Individual Defendants, by virtue of their executive positions within Gammon, had control over Gammon's public statements, including its misrepresentations concerning its production rate.   Further, each of the Individual Defendants had access, through their control over Gammon's operations, to reports and other information which would have disclosed Gammon's true production rates.

78.    Midas reasonably and justifiably relied upon Gammon and the Individual

Defendants' statements, which included fraudulent misrepresentations and omitted to state material facts.

79.    As a result of Midas's reasonable and justifiable reliance on Gammon's and the Individual Defendants' misrepresentations and omissions, it paid an inflated price for its shares of Gammon common and has been damaged in an amount to be proven at trial but believed to be in excess of $2.4 million.

80.    Gammon's and the Individual Defendants' conduct of intentionally or recklessly, by use of the means and instrumentalities of interstate commerce, the mails and, a national securities exchange, making untrue statements of material facts and omitting to state material facts necessary to render the statements that they did make, in light of circumstances under which they were made, not misleading constitutes violations of Section 10(b) of the 34 Act, 15 U.S.C. § 78j(b) and Rule 10b-5.

81.    Gammon's and the Individual Defendants' misrepresentations were made willfully and maliciously, and the actions of defendant were taken in willful and wanton disregard of the rights of Midas and other reasonable investors, thus entitling Midas to an award of punitive damages.

AS AND FOR A SECOND CAUSE OF ACTION
(Violation of Section 11 of the 33 Act)
(As Against All Defendants)

82.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 81 as if set forth fully herein.

83.    The securities issued by Gammon in April 2007 were offered pursuant to the terms of the Registration Statement.

84.    The Registration Statement incorporated by reference the materially false and

misleading statements and omissions contained in Gammon's press releases dated January 11, January 16, January 22, January 29, and April 2, 2007 to the effect that Gammon had achieved an annualized run rate of 400,000 gold equivalent ounces in January of 2007 and that it was scheduled to produce in excess of 400,000 gold equivalent ounces in 2007.

85.    Each of the Individual Defendants executed the Registration Statement on behalf of Gammon.

86.    Each of the Underwriter Defendants were designated as the underwriters for the transaction detailed in the Registration Statement, and the Underwriter Defendants committed to purchase the entire Gammon offering on a "bought-deal" basis.

87.    Midas purchased 400,000 shares of Gammon during the April 2007 offering pursuant to the terms of the Registration Statement and prospectus.

88.    Midas has been damaged as a result of the false and misleading statements contained in the Registration Statement in an amount to be proven at trial but believed to be in excess of $2.4 million.

89.    By reason of the foregoing, Gammon, the Individual Defendants and the Underwriter Defendants have violated Section 11 of the 33 Act, 15 U.S.C. § 77k.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of Section 12 of the 33 Act)
### (As Against All Defendants)

90.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 89 as if set forth fully herein.

91.    The securities issued by Gammon in April 2007 were offered pursuant to the terms of the Registration Statement, which incorporated the form of prospectus actually distributed to potential investors.

92.     The Registration Statement incorporated by reference the materially false and misleading statements and omissions contained in Gammon's press releases dated January 11, January 16, January 22, January 29, and April 2, 2007 to the effect that Gammon had achieved an annualized run rate of 400,000 gold equivalent ounces in January of 2007 and that it was scheduled to produce in excess of 400,000 gold equivalent ounces in 2007.

93.     Each of the Individual Defendants executed the Registration Statement on behalf of Gammon.

94.     By virtue of their positions as senior officers and/or directors of Gammon, each of the Individual Defendants had the opportunity to review the Registration Statement and prospectus prior to its dissemination to the public and correct any misstatements or omissions contained therein.

95.     Each of the Individual Defendants failed to review the Registration Statement and correct any such misstatements or omissions.

96.     In addition, Defendant George made false and misleading oral statements during conference calls and presentations as described above.

97.     Each of the Underwriter Defendants were designated as the underwriters for the transaction detailed in the Registration Statement, and the Underwriter Defendants committed to purchase the entire Gammon offering on a "bought-deal" basis.

98.     Midas purchased 400,000 shares of Gammon during the April 2007 offering pursuant to the terms of the Registration Statement and prospectus.

99.     Midas has been damaged as a result of the false and misleading statements contained in the Registration Statement and George's oral communications in an amount to be proven at trial but believed to be in excess of $2.4 million.

100.    By reason of the foregoing, Gammon, the Individual Defendants and the Underwriter Defendants have violated section 12(a)(2) of the 33 Act, 15 U.S.C. § 77l(a)(2).

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Violation of Section 20(a) of the 34 Act and Section 15 of the 33 Act)**
**(As Against the Individual Defendants)**

101.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 100 as if set forth fully herein.

102.    Gammon has violated section 10b of the 34 Act and sections 11 and 12(a)(2) of the 33 Act.

103.    During the time when Gammon was engaged in its primary violations of these provisions, the Individual Defendants, by virtue of their positions as senior officers and/or directors of Gammon, controlled the activities of Gammon, and in particular controlled Gammon's statements in the months prior to the April 2007 offering as well as the contents of the Registration Statement. Further, each of the Individual Defendants had access, through their control over Gammon's operations, to reports and other information which would have disclosed Gammon's true production rates.

104.    Each of the Individual Defendants executed the Registration Statement.

105.    Each of the Individual Defendants were culpable participants in Gammon's violation of the securities laws, in that each of the Individual Defendants had the opportunity to review the Registration Statement and prospectus prior to its dissemination to the public and correct any misstatement or omissions contained therein, but failed to do so.

106.    Midas has been damaged as a result of the false and misleading statements contained in the Registration Statement and Gammon's press releases and communications in

107.   By reason of the foregoing, each of the Individual Defendants have violated sections 20(a) and 15 of the 34 Act, 15 U.S.C. §§ 77m, 78t(a).

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### (As Against Gammon)

108.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 107 as if set forth fully herein.

109.   In good faith, Plaintiff Midas purchased 400,000 common shares of Gammon for $8,000,000 (Canadian).

110.   Defendant Gammon accepted the benefit of the investment.

111.   By making the investment, Midas bestowed a benefit upon Defendant.

112.   The Defendant obtained such benefit under false pretenses and did not adequately compensate Midas.

113.   The Defendants reaped such a benefit from Midas's investment that equity and good conscience require that restitution be made.

114.   Midas has been damaged by Defendant Gammon's acts in an amount to be proven at trial but believed to be in excess of $2.4 million, plus interest.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Fraud)
### (As Against All Defendants)

115.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 114 as if set forth fully herein.

116.    As detailed above, Defendant Gammon made repeated, false and misleading statements and omissions of material fact in connection with the purchase and sale of common shares of Gammon.

117.    Defendant Gammon repeatedly and publicly misrepresented that it was scheduled to produce 400,000 gold equivalent ounces in 2007 with the intent to induce investors to pay $20 (Canadian) per share for Gammon's common shares.

118.    At the time Defendant Gammon made the misrepresentations, it knew that its mines were not operating at a rate of production necessary to produce 400,000 gold equivalent ounces.

119.    Midas reasonably and justifiably relied upon Defendant's statements, which included fraudulent misrepresentations and omissions of material facts.

120.    Each of the Individual Defendants and the Underwriting Defendants took substantial steps to aid and abet Gammon's fraud upon Midas, including but not limited to, by executing the Registration Statement and/or failing to ensure that the Registration Statement was free from material misstatements and omissions.

121.    As a result of Midas's reasonable and justifiable reliance on Defendant Gammon's misrepresentations, it has been damaged in an amount to be proven at trial but believed to be in excess of $2.4 million.

122.    Defendant's misrepresentations were made willfully and maliciously, and the

actions of Defendant were taken in willful and wanton disregard of the rights of Midas, thus

entitling Midas to an award of punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Negligence)
### (As Against Gammon)

123.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1

through 122 as if set forth fully herein.

124.    At all relevant times, Defendant Gammon owed Midas the highest degree of

fidelity, loyalty, and fairness in their mutual dealings and had a duty to exercise reasonable

care to ensure the truth, accuracy, and completeness of the representations made to Midas and

other reasonable investors.

125.    The duties owed to Midas by the Defendant resulted both from their business

dealings prior to the anticipated purchase of the common shares as well as their relationship

resulting therefrom.

126.    Defendant Gammon's duties to Midas resulted from the fact that Defendant

Gammon was in a unique position to know the actual scheduled production of its own mines.

127.    Defendant Gammon failed to exercise reasonable care to ensure, at all times,

the complete, accurate, and truthful disclosure of material facts to Midas and other reasonable

investors.

128.    Defendant Gammon made negligent misrepresentations and omissions of

material fact to Midas and the public at large, including, inter alia, that Defendant Gammon

was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007.

129.    The negligent misrepresentations were incomplete, inaccurate, or untruthful.

130.    Defendant, as well as its underwriters, conspired, participated in, made,

approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, and/or failed to prevent the acts, conduct, and omissions described herein.

131.    As a direct and proximate result thereof, Midas has suffered actual and consequential damages in a sum to be determined at trial believed to be in excess of $2.4 million.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Deceptive Acts and Practices
### N.Y. Business Law §§ 349 and 350)
### (As Against Gammon)

132.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 131 as if set forth fully herein.

133.    Defendant's misrepresentations, including, *inter alia*, that Defendant Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007, were materially misleading.

134.    Defendant's misrepresentations, including, *inter alia*, that Defendant Gammon was scheduled for a production of 400,000 gold equivalent ounces for the calendar year 2007, were consumer-oriented.

135.    Plaintiff Midas was monetarily injured by Defendant's practices, acts, and omissions.

136.    By reason of the foregoing, Defendant violated N.Y. General Business Law, Article 22-A, Consumer Protection from Deceptive Acts and Practices, Sections 349 and 350.

137.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Midas has been damaged in a sum to be determined at trial believed to be in excess of $2.4 million, together with interest and attorneys' fees.

138.    Defendant's conduct, as set forth above, was knowing, willful, intentional, and

deliberate, and involved circumstances of malice, fraud, bad faith, bad motive, circumstances of aggravation or outrage, and reckless, willful, wanton, and conscious disregard or indifference to Plaintiff's rights.    As a result, Plaintiff is entitled to an award of treble damages in accordance with N.Y. Gen. Bus. Law § 349(h) in an exact amount to be determined at trial.

WHEREFORE, Midas demands a judgment as follows:

1.   On the first cause of action, awarding damages against Gammon and the Individual Defendant in the amount of at least $2.4 million, punitive damages, attorney's fees, costs and interest;

2.   On the second cause of action, awarding damages against all Defendants in the amount of at least $2.4 million, attorney's fees, costs and interest;

3.   On the third cause of action, awarding damages against all Defendants in the amount of at least $2.4 million, attorney's fees, costs and interest;

4.   On the fourth cause of action, awarding damages against the Individual Defendants in the amount of $2.4 million, attorney's fees, costs and interest;

5.   On the fifth cause of action, awarding damages against Gammon in the amount of $2.4 million, punitive damages, attorney's fees, costs and interest;

6.   On the sixth cause of action, awarding damages against all Defendants in the amount of $2.4 million, punitive damages, attorney's fees, costs and interest;

7.   On the seventh cause of action, awarding damages against Gammon in the amount of $2.4 million, punitive damages, attorney's fees, costs and interest;

8.   On the eighth cause of action, awarding damages against Gammon in the amount of $2.4 million, punitive damages, attorney's fees, costs and interest; and

24

9.   Such other and further relief as the Court may deem just and proper, including

reasonable attorneys' fees and the costs and disbursements of this action.

Dated:   New York, New York
October 12, 2007

GUZOV OFSINK, LLC

By: _____
     Debra J. Guzov (DG 7125)
     David J. Kaplan (DK 0100)
     *Attorneys for Plaintiff*
     *Midas Fund, Inc.*
     600 Madison Avenue, 14th Floor
     New York, NY 10022
     (212) 371-8008

## JURY TRIAL DEMAND

Plaintiff respectfully requests a jury trial for the adjudication of all claims for which a

jury is available under the Seventh Amendment of the United States Constitution.

Dated:  New York, New York
October 12, 2007

GUZOV OFSINK, LLC

By: _____
Debra J Guzov (DG 7125)
David J. Kaplan (DK 0100)
*Attorneys for Plaintiff*
*Midas Fund, Inc.*
600 Madison Avenue, 14th Floor
New York, NY 10022
(212) 371-8008

SERVICE LIST

*Midas Fund, Inc. vs Gammon Gold et al.*, 07 CV 6707 (NRB)

Gammon Gold, Inc.
c/o Dorsey & Whitney LLP
Attn: Thomas Swigert, Esq.
Suite 1500
50 South Sixth Street
Minneapolis, MN 55402-1498

Fred George
Bradley Langille
Russell Barwick
Colin Sutherland
c/o Gammon Gold, Inc.
1601 Lower Water Street
Suite 402, Summit Place, P.O. Box 2067
Halifax, Nova Scotia B3J 2Z1
Canada

BMO Nesbitt Burns, Inc.
3 Times Square
New York, NY 10036

TD Securities, Inc.
31 W. 52nd St.
New York, NY 10019

Scotia Capital, Inc.
One Liberty Plaza
165 Broadway
New York, NY 10006