properties or prospects for mineral exploration. The Company may be at a competitive disadvantage in acquiring additional mining properties because it must compete with other individuals and companies, many of which have greater financial resources, operational experience and technical capabilities than the Company. The Company may also encounter increasing competition from other mining companies in its efforts to hire experienced mining professionals. Competition for exploration resources at all levels is currently very intense, particularly affecting the availability of manpower, drill rigs and helicopters. Increased competition could adversely affect the Company's ability to attract necessary capital funding or acquire suitable producing properties or prospects for mineral exploration in the future.

Recent increases in gold prices have encouraged increases in mining exploration, development and construction activities, which have resulted in increased demand for, and cost of, exploration, development and construction services and equipment. Increased demand for services and equipment could cause project costs to increase materially, resulting in delays if services or equipment cannot be obtained in a timely manner due to inadequate availability, and increase potential scheduling difficulties and cost increases due to the need to coordinate the availability of services or equipment, any of which could materially increase project exploration, development or construction costs, result in project delays or both.

*The trading price for the Company's securities is volatile.* The trading price of the Company's common shares may be subject to large fluctuations. The trading price of the Company's common shares may increase or decrease in response to a number of events and factors, including: the price of gold and other metals, the Company's operating performance and the performance of competitors and other similar companies, the public's reaction to the Company's press releases, other public announcements and the Company's filings with the various securities regulatory authorities, changes in earnings estimates or recommendations by research analysts who track the Company's common shares or the shares of other companies in the resource sector, changes in general economic conditions, the number of the Company's common shares to be publicly traded after an offering, the arrival or departure of key personnel, and acquisitions, strategic alliances or joint ventures involving the Company or its competitors.

In addition, the market price of the Company's shares are affected by many variables not directly related to the Company's success and are therefore not within the Company's control, including other developments that affect the market for all resource sector shares, the breadth of the public market for the Company's shares, and the attractiveness of alternative investments. The effect of these and other factors on the market price of the common shares on the exchanges in which the Company trades has historically made the Company's share price volatile and suggests that the Company's share price will continue to be volatile in the future.

*The Company may raise funds for future operations through the issuance of shares, debt instruments or other securities convertible into shares and such financings may result in the dilution of present and prospective shareholdings.* In order to finance future operations, the Company may raise funds through the issuance of shares or the issuance of debt instruments or other securities convertible into shares. The Company cannot predict the size of future issuances of common shares or the issuance of debt instruments or other securities convertible into shares or the effect, if any, that future issuances and sales of the Company's securities will have on the market price of the Company's common shares. Any transaction involving the issuance of previously authorized but unissued shares, or securities convertible into shares, would result in dilution, possibly substantial, to present and prospective security holders.

*Because the Company's producing properties are located in Mexico and will have production costs incurred in Mexican pesos, while gold and other metals are generally sold in United States dollars, the Mexican project results could be materially adversely affected by an appreciation of the Mexican peso.* Gold and other metals are sold throughout the world principally in United States dollars. The Company's operating costs for its Mexican projects are incurred in Mexican pesos and certain costs are incurred and certain debt obligations are owed in United States dollars. As a result, any significant and sustained appreciation of the Mexican peso against the United States dollar, or of the United States dollar against the Canadian dollar, may materially increase the Company's costs and reduce revenues, if any, on its Mexican projects. The Company does not currently use any derivative products to manage or mitigate any foreign exchange exposure.

*Because the Company does not currently intend to use forward sale arrangements to protect against low commodity prices, the Company's operating results are exposed to the impact of any significant drop in commodity prices.* The

14

Company does not currently intend to enter into forward sales arrangements to reduce the risk of exposure to volatility in commodity prices. Accordingly, the Company's future operations are exposed to the impact of any significant decrease in commodity prices. If such prices decrease significantly at a time when the Company is producing, the Company would realize reduced revenues. While it is not the Company's current intention to enter into forward sales arrangements, the Company is not restricted from entering into forward sales arrangements at a future date.

*No dividends have been or will be paid in the foreseeable future.*    To date, the Company has paid no dividends on its common shares. The Company intends to retain its earnings, if any, to finance the growth and development of the business and does not intend to pay dividends on the common shares in the foreseeable future. Any return on an investment in the Company's common shares will come from the appreciation, if any, in the value of the common shares. The payment of future dividends, if any, will be reviewed periodically by the Company's board of directors and will depend upon, among other things, conditions then existing including earnings, financial condition and capital requirements, restrictions in financing agreements, business opportunities and conditions and other factors.

*The Company may fail to achieve and maintain the adequacy of internal control over financial reporting as per the requirements of the Sarbanes-Oxley Act.*    The Company documented and tested during its most recent fiscal year, its internal control procedures in order to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act ("SOX"). SOX requires an annual assessment by management of the effectiveness of the Company's internal control over financial reporting and an attestation report by the Company's independent auditors addressing this assessment. The Company may fail to achieve and maintain the adequacy of its internal control over financial reporting as such standards are modified, supplemented, or amended from time to time, and the Company may not be able to ensure that it can conclude on an ongoing basis that it has effective internal controls over financial reporting in accordance with Section 404 of SOX. The Company's failure to satisfy the requirements of Section 404 of SOX on an ongoing, timely basis could result in the loss of investor confidence in the reliability of its financial statements, which in turn could harm the Company's business and negatively impact the trading price of its common shares or market value of its other securities. In addition, any failure to implement required new or improved controls, or difficulties encountered in their implementation, could harm the Company's operating results or cause it to fail to meet its reporting obligations. Future acquisitions of companies may provide the Company with challenges in implementing the required processes, procedures and controls in its acquired operations. Acquired companies may not have disclosure controls and procedures or internal control over financial reporting that are as thorough or effective as those required by securities laws currently applicable to the Company.

No evaluation can provide complete assurance that the Company's internal control over financial reporting will detect or uncover all failures of persons within the Company to disclose material information otherwise required to be reported. The effectiveness of the Company's control and procedures could also be limited by simple errors or faulty judgments. In addition, as the Company continues to expand, the challenges involved in implementing appropriate internal controls over financial reporting will increase and will require that the Company continue to improve its internal controls over financial reporting. Although the Company intends to devote substantial time and incur substantial costs, as necessary, to ensure ongoing compliance, the Company cannot be certain that it will be successful in complying with Section 404.

*The Company may be a "passive foreign investment company" for the current and future taxable years under the U.S. Internal Revenue Code, which may result in adverse tax consequences for investors in the United States.*    Shareholders and potential investors that are U.S. taxpayers should be aware that the Company may be a "passive foreign investment company" under Section 1297(a) of the U.S. Internal Revenue Code (a "PFIC") for the current and future taxable years. If the Company is or becomes a PFIC, any gain recognized on the sale of common shares and any "excess distributions" (as specifically defined) paid on the common shares must be ratably allocated to each day in a U.S. taxpayer's holding period for the common shares. The amount of any such gain or excess distribution allocated to prior years of such U.S. taxpayer's holding period for the common shares generally will be subject to U.S. federal income tax at the highest tax applicable to ordinary income in each such prior year, and the U.S. taxpayer will be required to pay interest on the resulting tax liability for each such prior year, calculated as if such tax liability had been due in each such prior year.

15

As an alternative to the U.S. federal income tax treatment if the Company is a PFIC as described above, a U.S. taxpayer that makes a "QEF election" generally will be subject to U.S. federal income tax on such U.S. taxpayer's pro rata share of the Company's "net capital gain" and "ordinary earnings" (calculated under U.S. federal income tax rules), regardless of whether such amounts are actually distributed by the Company. The Company will make available to U.S. Holders, upon their request, timely and accurate information as to its status as a PFIC and will use commercially reasonable efforts to provide to a purchaser acquiring common shares pursuant to this Offering that is a U.S. Holder all information that a U.S. Holder making a QEF Election with respect to the Company and any Subsidiary PFIC (as defined below under "U.S. Federal Income Tax Considerations — Passive Foreign Investment Company") is required to obtain for U.S. federal income tax purposes. As a second alternative, a U.S. taxpayer may make a "mark-to-market election" if the Company is a PFIC and the common shares are "marketable stock" (as specifically defined). A U.S. taxpayer that makes a mark-to-market election generally will include in gross income, for each taxable year in which the Company is a PFIC, an amount equal to the excess, if any, of (a) the fair market value of the common shares as of the close of such taxable year over (b) such U.S. taxpayer's tax basis in such common shares.

## U.S. FEDERAL INCOME TAX CONSIDERATIONS

In the opinion of Dorsey & Whitney LLP, counsel to the Company, the following is a summary of certain material U.S. federal income tax consequences to a U.S. Holder (as defined below) arising from and relating to the acquisition, ownership, and disposition of common shares acquired pursuant to this Offering.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential U.S. federal income tax consequences that may apply to a U.S. Holder arising from and relating to the acquisition, ownership, and disposition of common shares pursuant to this Offering. In addition, this summary does not take into account the individual facts and circumstances of any particular U.S. Holder that may affect the U.S. federal income tax consequences to such U.S. Holder. Accordingly, this summary is not intended to be, and should not be construed as, legal or U.S. federal income tax advice with respect to any U.S. Holder. Each U.S. Holder should consult its own financial advisor, legal counsel, or accountant regarding the U.S. federal income, U.S. state and local, and foreign tax consequences arising from and relating to the acquisition, ownership, and disposition of common shares.

No legal opinion from U.S. legal counsel or ruling from the Internal Revenue Service (the "IRS") has been requested, or will be obtained, regarding the U.S. federal income tax consequences arising from and relating to acquisition, ownership, and disposition of common shares. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions taken in this summary. In addition, because the authorities on which this summary is based are subject to various interpretations, the IRS and the U.S. courts could disagree with one or more of the positions taken in this summary.

**Scope of this Summary**

Authorities

This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations (whether final, temporary, or proposed), published rulings of the IRS, published administrative positions of the IRS, the Convention Between Canada and the United States of America with Respect to Taxes on Income and on Capital, signed September 26, 1980, as amended (the "Canada-U.S. Tax Convention"), and U.S. court decisions that are applicable and, in each case, as in effect and available, as of the date of this Offering. Any of the authorities on which this summary is based could be changed in a material and adverse manner at any time, and any such change could be applied on a retroactive basis. This summary does not discuss the potential effects, whether adverse or beneficial, of any proposed legislation that, if enacted, could be applied on a retroactive basis.

U.S. Holders

For purposes of this summary, a "U.S. Holder" is a beneficial owner of common shares, that, for U.S. federal income tax purposes, is (a) an individual who is a citizen or resident of the U.S., (b) a corporation,

16

or any other entity classified as a corporation for U.S. federal income tax purposes, that is created or organized in or under the laws of the U.S., any state in the U.S., or the District of Columbia, (c) an estate if the income of such estate is subject to U.S. federal income tax regardless of the source of such income, or (d) a trust if (i) such trust has validly elected to be treated as a U.S. person for U.S. federal income tax purposes or (ii) a U.S. court is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of such trust.

<u>Non-U.S. Holders</u>

For purposes of this summary, a "non-U.S. Holder" is a beneficial owner of common shares that is neither a U.S. Holder nor a partnership (or any other entity classified as a partnership for U.S. federal income tax purposes). This summary does not address the U.S. federal income tax consequences to non-U.S. Holders arising from and relating to the acquisition, ownership, and disposition of common shares. Accordingly, a non-U.S. Holder should consult its own financial advisor, legal counsel, or accountant regarding the U.S. federal income, U.S. state and local, and foreign tax consequences (including the potential application of and operation of any income tax treaties) arising from and relating to the acquisition, ownership, and disposition of common shares.

<u>U.S. Holders Subject to Special U.S. Federal Income Tax Rules Not Addressed</u>

This summary does not address the U.S. federal income tax consequences applicable to U.S. Holders that are subject to special provisions under the Code, including the following U.S. Holders: (a) U.S. Holders that are tax-exempt organizations, qualified retirement plans, individual retirement accounts, or other tax-deferred accounts; (b) U.S. Holders that are financial institutions, insurance companies, real estate investment trusts, or regulated investment companies; (c) U.S. Holders that are dealers in securities or currencies or U.S. Holders that are traders in securities that elect to apply a mark-to-market accounting method; (d) U.S. Holders that have a "functional currency" other than the U.S. dollar; (e) U.S. Holders that are liable for the alternative minimum tax under the Code; (f) U.S. Holders that own common shares as part of a straddle, hedging transaction, conversion transaction, constructive sale, or other arrangement involving more than one position; (g) U.S. Holders that acquired common shares in connection with the exercise of employee stock options or otherwise as compensation for services; (h) U.S. Holders that hold common shares other than as a capital asset within the meaning of Section 1221 of the Code; or (i) U.S. Holders that own (directly, indirectly, or by attribution) 10% or more of the total combined voting power of the outstanding shares of the Company. U.S. Holders that are subject to special provisions under the Code, including U.S. Holders described immediately above, should consult their own financial advisor, legal counsel or accountant regarding the U.S. federal income tax consequences arising from and relating to the acquisition, ownership, and disposition of common shares.

If an entity that is classified as a partnership for U.S. federal income tax purposes holds common shares, the U.S. federal income tax consequences to such partnership and the partners of such partnership generally will depend on the activities of the partnership and the status of such partners. Partners of entities that are classified as partnerships for U.S. federal income tax purposes should consult their own financial advisor, legal counsel or accountant regarding the U.S. federal income tax consequences arising from and relating to the acquisition, ownership, and disposition of common shares.

<u>Tax Consequences Other than U.S. Federal Income Tax Consequences Not Addressed</u>

This summary does not address the U.S. state and local, U.S. federal estate and gift, or foreign tax consequences to U.S. Holders arising from and relating to the acquisition, ownership, and disposition of common shares. Each U.S. Holder should consult its own financial advisor, legal counsel, or accountant regarding the U.S. state and local, U.S. federal estate and gift, and foreign tax consequences arising from and relating to the acquisition, ownership, and disposition of common shares.

**U.S. Federal Income Tax Consequences of the Acquisition, Ownership, and Disposition of common shares**

Distributions on Common Shares

*General Taxation of Distributions*

Subject to the "passive foreign investment company" rules discussed below, a U.S. Holder that receives a distribution, including a constructive distribution, of cash or property (other than certain distributions of shares distributed pro rata to all shareholders of the Company with respect to the common shares will be required to include the amount of such distribution in gross income as a dividend (without reduction for any Canadian income tax withheld from such distribution) to the extent of the current or accumulated "earnings and profits" of the Company. To the extent that a distribution exceeds the current and accumulated "earnings and profits" of the Company, such distribution will be treated (a) first, as a tax-free return of capital to the extent of a U.S. Holder's tax basis in the common shares and, (b) thereafter, as gain from the sale or exchange of such common shares. (See more detailed discussion at "Disposition of Common Shares" below). Dividends paid on the common shares generally will not be eligible for the "dividends received deduction."

For taxable years beginning before January 1, 2011, a dividend paid by the Company generally will be taxed at the preferential tax rates applicable to long-term capital gains if, among certain other requirements, (a) the Company is a "qualified foreign corporation" (as defined below), (b) the U.S. Holder receiving such dividend is an individual, estate, or trust, and (c) such dividend is paid on common shares that have been held by such U.S. Holder for at least 61 days during the 121-day period beginning 60 days before the "ex-dividend date" (i.e., the first date that a purchaser of such common shares will not be entitled to receive such dividend).

The Company generally will be a "qualified foreign corporation" under Section 1(h)(11) of the Code (a "QFC") if (a) the Company is eligible for the benefits of the Canada-U.S. Tax Treaty, or (b) the common shares are readily tradable on an established securities market in the U.S., within the meaning provided in the Code. However, even if the Company satisfies one or more of such requirements, the Company will not be treated as a QFC if the Company is a "passive foreign investment company" (as defined below) for the taxable year during which the Company pays a dividend or for the preceding taxable year. If the Company is not a QFC, a dividend paid by the Company to a U.S. Holder that is an individual, estate, or trust generally will be taxed at ordinary income tax rates (and not at the preferential tax rates applicable to long-term capital gains). The dividend rules are complex, and each U.S. Holder should consult its own financial advisor, legal counsel, or accountant regarding the application of such rules to its particular circumstances.

*Distributions Paid in Foreign Currency*

The amount of a distribution paid to a U.S. Holder in foreign currency generally will be equal to the U.S. dollar value of such distribution based on the exchange rate applicable on the date of receipt. A U.S. Holder that does not convert foreign currency received as a distribution into U.S. dollars on the date of receipt generally will have a tax basis in such foreign currency equal to the U.S. dollar value of such foreign currency on the date of receipt. Such a U.S. Holder generally will recognize ordinary income or loss on the subsequent sale or other taxable disposition of such foreign currency (including an exchange for U.S. dollars).

Disposition of Common Shares

A U.S. Holder will recognize gain or loss on the sale or other taxable disposition of common shares in an amount equal to the difference, if any, between (a) the amount of cash plus the fair market value of any property received and (b) such U.S. Holder's tax basis in the common shares sold or otherwise disposed of. Subject to the "passive foreign investment company" rules discussed below, any such gain or loss generally will be capital gain or loss, which will be long-term capital gain or loss if the common shares are held for more than one year. Gain or loss recognized by a U.S. Holder on the sale or other taxable disposition of common shares generally will be treated as "U.S. source" for purposes of applying the U.S. foreign tax credit rules. (See more detailed discussion at "Foreign Tax Credit" below).

Preferential tax rates apply to long-term capital gains of a U.S. Holder that is an individual, estate, or trust. There are currently no preferential tax rates for long-term capital gains of a U.S. Holder that is a corporation. Deductions for capital losses are subject to significant limitations under the Code.

Foreign Tax Credit

A U.S. Holder that pays (whether directly or through withholding) Canadian income tax with respect to dividends received on the common shares generally will be entitled, at the election of such U.S. Holder, to receive either a deduction or a credit for such Canadian income tax paid. Generally, a credit will reduce a U.S. Holder's U.S. federal income tax liability on a dollar-for-dollar basis, whereas a deduction will reduce a U.S. Holder's income subject to U.S. federal income tax. This election is made on a year-by-year basis and applies to all foreign taxes paid (whether directly or through withholding) by a U.S. Holder during a taxable year.

Complex limitations apply to the foreign tax credit, including the general limitation that the credit cannot exceed the proportionate share of a U.S. Holder's U.S. federal income tax liability that such U.S. Holder's "foreign source" taxable income bears to such U.S. Holder's worldwide taxable income. In applying this limitation, a U.S. Holder's various items of income and deduction must be classified, under complex rules, as either "foreign source" or "U.S. source." In addition, this limitation is calculated separately with respect to specific categories of income (including "passive income," "high withholding tax interest," "financial services income," "general income," and certain other categories of income). Dividends received on the common shares generally will constitute "foreign source" income and generally will be categorized as "passive income" or, in the case of certain U.S. Holders, "financial services income." However, for taxable years beginning after December 31, 2006, the foreign tax credit limitation categories are reduced to "passive category income" and "general category income" (and the other categories of income, including "financial services income," are eliminated). The foreign tax credit rules are complex, and each U.S. Holder should consult its own financial advisor, legal counsel, or accountant regarding the foreign tax credit rules.

Information Reporting; Backup Withholding Tax

Payments made within the U.S., or by a U.S. payor or U.S. middleman, of dividends on, or proceeds arising from the sale or other taxable disposition of, common shares generally will be subject to information reporting and backup withholding tax, at the rate of 28%, if a U.S. Holder (a) fails to furnish such U.S. Holder's correct U.S. taxpayer identification number (generally on Form W-9), (b) furnishes an incorrect U.S. taxpayer identification number, (c) is notified by the IRS that such U.S. Holder has previously failed to properly report items subject to backup withholding tax, or (d) fails to certify, under penalty of perjury, that such U.S. Holder has furnished its correct U.S. taxpayer identification number and that the IRS has not notified such U.S. Holder that it is subject to backup withholding tax. However, U.S. Holders that are corporations generally are excluded from these information reporting and backup withholding tax rules. Any amounts withheld under the U.S. backup withholding tax rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, or will be refunded, if such U.S. Holder furnishes required information to the IRS. Each U.S. Holder should consult its own financial advisor, legal counsel, or accountant regarding the information reporting and backup withholding tax rules.

**Additional Rules that May Apply to U.S. Holders**

If the Company is a "passive foreign investment company" (as defined below), the preceding sections of this summary may not describe the U.S. federal income tax consequences to U.S. Holders of the acquisition, ownership, and disposition of common shares.

Passive Foreign Investment Company

*Passive Foreign Investment Company*

The Company generally will be a "passive foreign investment company" under Section 1297(a) of the Code (a "PFIC") if, for a taxable year, (a) 75% or more of the gross income of the Company for such taxable year is passive income or (b) on average, 50% or more of the assets held by the Company either produce passive income or are held for the production of passive income, based on the fair market value of such assets (or on the adjusted tax basis of such assets, if the Company is not publicly traded and either is a "controlled foreign corporation" or makes an election). "Passive income" includes, for example, dividends, interest, certain rents and royalties, certain gains from the sale of stock and securities, and certain gains from commodities transactions.

19

For purposes of the PFIC income test and asset test described above, if the Company owns, directly or indirectly, 25% or more of the total value of the outstanding shares of another foreign corporation, the Company will be treated as if it (a) held a proportionate share of the assets of such other foreign corporation and (b) received directly a proportionate share of the income of such other foreign corporation. In addition, for purposes of the PFIC income test and asset test described above, "passive income" does not include any interest, dividends, rents, or royalties that are received or accrued by the Company from a "related person" (as defined in Section 954 (d)(3) of the Code), to the extent such items are properly allocable to the income of such related person that is not passive income.

In addition, if the Company is a PFIC and owns shares of another foreign corporation that also is a PFIC (a "subsidiary PFIC"), under certain indirect ownership rules, a disposition of the shares of such other foreign corporation or a distribution received from such other foreign corporation generally will be treated as an indirect disposition by a U.S. Holder or an indirect distribution received by a U.S. Holder, subject to the rules of Section 1291 of the Code discussed below. To the extent that gain recognized on the actual disposition by a U.S. Holder of the Company's common shares or income recognized by a U.S. Holder on an actual distribution received on the Company's common shares was previously subject to U.S. federal income tax under these indirect ownership rules, such amount generally should not be subject to U.S. federal income tax.

Based on management's financial operating plans, the Company does not expect that it will be a PFIC for its current taxable year and for the foreseeable future. The determination of whether the Company will be a PFIC for a taxable year depends, in part, on the application of complex U.S. federal income tax rules, which are subject to differing interpretations. In addition, whether the Company will be a PFIC for its current taxable year and each subsequent taxable year depends on the assets and income of the Company over the course of each such taxable year and, as a result, cannot be predicted with certainty as of the date of this Offering. Accordingly, there can be no assurance that the IRS will not challenge the determination made by the Company concerning its PFIC status or that the Company will not be a PFIC for any taxable year.

*Default PFIC Rules Under Section 1291 of the Code*

If the Company is a PFIC, the U.S. federal income tax consequences to a U.S. Holder of the acquisition, ownership, and disposition of common shares will depend on whether such U.S. Holder makes an election to treat the Company and each Subsidiary PFIC, if any, as a "qualified electing fund" or "QEF" under Section 1295 of the Code (a "QEF Election") or a mark-to-market election under Section 1296 of the Code (a "Mark-to-Market Election"). A U.S. Holder that does not make either a QEF Election or a Mark-to-Market Election will be referred to in this summary as a "Non-Electing U.S. Holder."

A Non-Electing U.S. Holder will be subject to the rules of Section 1291 of the Code with respect to (a) any gain recognized on the sale or other taxable disposition of common shares and (b) any excess distribution received on the common shares. A distribution generally will be an "excess distribution" to the extent that such distribution (together with all other distributions received in the current taxable year) exceeds 125% of the average distributions received during the three preceding taxable years (or during a U.S. Holder's holding period for the common shares, if shorter).

Under Section 1291 of the Code, any gain recognized on the sale or other taxable disposition of common shares, and any excess distribution received on the common shares, must be ratably allocated to each day in a Non-Electing U.S. Holder's holding period for the common shares. The amount of any such gain or excess distribution allocated to prior years of such Non-Electing U.S. Holder's holding period for the common shares (other than years prior to the first taxable year of the Company beginning after December 31, 1986 for which the Company was not a PFIC) will be subject to U.S. federal income tax at the highest tax rate applicable to ordinary income in each such prior year. A Non-Electing U.S. Holder will be required to pay interest on the resulting tax liability for each such prior year, calculated as if such tax liability had been due in each such prior year. Such a Non-Electing U.S. Holder that is not a corporation must treat any such interest paid as "personal interest," which is not deductible. The amount of any such gain or excess distribution allocated to the current year of such Non-Electing U.S. Holder's holding period for the common shares will be treated as ordinary income in the current year, and no interest charge will be incurred with respect to the resulting tax liability for the current year.

If the Company is a PFIC for any taxable year during which a Non-Electing U.S. Holder holds common shares, the Company will continue to be treated as a PFIC with respect to such Non-Electing U.S. Holder,

20

regardless of whether the Company ceases to be a PFIC in one or more subsequent taxable years. A Non-Electing U.S. Holder may terminate this deemed PFIC status by electing to recognize gain (which will be taxed under the rules of Section 1291 of the Code discussed above) as if such common shares were sold on the last day of the last taxable year for which the Company was a PFIC.

*QEF Election*

The procedure for making a QEF Election, and the U.S. federal income tax consequences of making a QEF Election, will depend on whether such QEF Election is timely. A QEF Election generally will be "timely" if it is made for the first year in a U.S. Holder's holding period for the common shares in which the Company is a PFIC. In this case, a U.S. Holder may make a timely QEF Election by filing the appropriate QEF Election documents with such U.S. Holder's U.S. federal income tax return for such first year in respect of the Company and each Subsidiary PFIC, if any. However, if the Company was a PFIC in a prior year in a U.S. Holder's holding period for the common shares, then in order to be treated as making a "timely" QEF Election, such U.S. Holder must elect to recognize gain (which will be taxed under the rules of Section 1291 of the Code discussed above) as if the common shares were sold on the qualification date for an amount equal to the fair market value of the common shares on the qualification date. The "qualification date" is the first day of the first taxable year in which the Company was a QEF with respect to such U.S. Holder. In addition, under very limited circumstances, a U.S. Holder may make a retroactive QEF Election if such U.S. Holder failed to file the QEF Election documents in a timely manner.

A QEF Election will apply to the taxable year for which such QEF Election is made and to all subsequent taxable years, unless such QEF Election is invalidated or terminated or the IRS consents to revocation of such QEF Election. If a U.S. Holder makes a QEF Election and, in a subsequent taxable year, the Company ceases to be a PFIC, the QEF Election will remain in effect (although it will not be applicable) during those taxable years in which the Company is not a PFIC. Accordingly, if the Company becomes a PFIC in another subsequent taxable year, the QEF Election will be effective and the U.S. Holder will be subject to the QEF rules described above during any such subsequent taxable year in which the Company qualifies as a PFIC. In addition, the QEF Election will remain in effect (although it will not be applicable) with respect to a U.S. Holder even after such U.S. Holder disposes of all of such U.S. Holder's direct and indirect interest in the common shares. Accordingly, if such U.S. Holder reacquires an interest in the Company, such U.S. Holder will be subject to the QEF rules described above for each taxable year in which the Company is a PFIC.

A U.S. Holder that makes a timely QEF Election generally will not be subject to the rules of Section 1291 of the Code discussed above. For example, a U.S. Holder that makes a timely QEF Election generally will recognize capital gain or loss on the sale or other taxable disposition of common shares.

However, for each taxable year in which the Company is a PFIC, a U.S. Holder that makes a QEF Election will be subject to U.S. federal income tax on such U.S. Holder's pro rata share of (a) the net capital gain of the Company and each Subsidiary PFIC, which will be taxed as long-term capital gain to such U.S. Holder, and (b) and the ordinary earnings of the Company and each Subsidiary PFIC, which will be taxed as ordinary income to such U.S. Holder. Generally, "net capital gain" is the excess of (a) net long-term capital gain over (b) net short-term capital loss, and "ordinary earnings" are the excess of (a) "earnings and profits" over (b) net capital gain. A U.S. Holder that makes a QEF Election will be subject to U.S. federal income tax on such amounts for each taxable year in which the Company is a PFIC, regardless of whether such amounts are actually distributed to such U.S. Holder by the Company. However, a U.S. Holder that makes a QEF Election may, subject to certain limitations, elect to defer payment of current U.S. federal income tax on such amounts, subject to an interest charge. If such U.S. Holder is not a corporation, any such interest paid will be treated as "personal interest," which is not deductible.

A U.S. Holder that makes a QEF Election generally (a) may receive a tax-free distribution from the Company to the extent that such distribution represents "earnings and profits" of the Company that were previously included in income by the U.S. Holder because of such QEF Election and (b) will adjust such U.S. Holder's tax basis in the common shares to reflect the amount included in income or allowed as a tax-free distribution because of such QEF Election.

The Company will make available to U.S. Holders, upon their request, timely and accurate information as to its status as a PFIC and will use commercially reasonable efforts to provide to a purchaser acquiring common

21

shares pursuant to this Offering that is a U.S. Holder all information that a U.S. Holder making a QEF Election with respect to the Company and any Subsidiary PFIC is required to obtain for U.S. federal income tax purposes.

*Mark-to-Market Election*

A U.S. Holder may make a Mark-to-Market Election only if the common shares are marketable stock. The common shares generally will be "marketable stock" if the common shares are regularly traded on a qualified exchange or other market. For this purpose, a "qualified exchange or other market" includes (a) a national securities exchange that is registered with the Securities and Exchange Commission, (b) the national market system established pursuant to section 11A of the Securities and Exchange Act of 1934, or (c) a foreign securities exchange that is regulated or supervised by a governmental authority of the country in which the market is located, provided that (i) such foreign exchange has trading volume, listing, financial disclosure, surveillance, and other requirements designed to prevent fraudulent and manipulative acts and practices, remove impediments to and perfect the mechanism of a free, open, fair, and orderly market, and protect investors (and the laws of the country in which the foreign exchange is located and the rules of the foreign exchange ensure that such requirements are actually enforced) and (ii) the rules of such foreign exchange effectively promote active trading of listed stocks. If the common shares are traded on such a qualified exchange or other market, the common shares generally will be "regularly traded" for any calendar year during which the common shares are traded, other than in de minimis quantities, on at least 15 days during each calendar quarter.

A Mark-to-Market Election applies to the taxable year in which such Mark-to-Market Election is made and to each subsequent taxable year, unless the common shares cease to be "marketable stock" or the IRS consents to revocation of such election. Each U.S. Holder should consult its own tax advisor regarding the availability of, and procedure for making, a Mark-to-Market Election.

A U.S. Holder that makes a Mark-to-Market Election generally will not be subject to the rules of Section 1291 of the Code discussed above. However, if a U.S. Holder makes a Mark-to-Market Election after the beginning of such U.S. Holder's holding period for the common shares and such U.S. Holder has not made a timely QEF Election, the rules of Section 1291 of the Code discussed above will apply to certain dispositions of, and distributions on, the common shares.

A U.S. Holder that makes a Mark-to-Market Election will include in ordinary income, for each taxable year in which the Company is a PFIC, an amount equal to the excess, if any, of (a) the fair market value of the common shares as of the close of such taxable year over (b) such U.S. Holder's adjusted tax basis in such common shares. A U.S. Holder that makes a Mark-to-Market Election will be allowed a deduction in an amount equal to the lesser of (a) the excess, if any, of (i) such U.S. Holder's adjusted tax basis in the common shares over (ii) the fair market value of such common shares as of the close of such taxable year or (b) the excess, if any, of (i) the amount included in ordinary income because of such Mark-to-Market Election for prior taxable years over (ii) the amount allowed as a deduction because of such Mark-to-Market Election for prior taxable years.

A U.S. Holder that makes a Mark-to-Market Election generally will adjust such U.S. Holder's tax basis in the common shares to reflect the amount included in gross income or allowed as a deduction because of such Mark-to-Market Election. In addition, upon a sale or other taxable disposition of common shares, a U.S. Holder that makes a Mark-to-Market Election will recognize ordinary income or loss (not to exceed the excess, if any, of (a) the amount included in ordinary income because of such Mark-to-Market Election for prior taxable years over (b) the amount allowed as a deduction because of such Mark-to-Market Election for prior taxable years).

Although a U.S. Holder may be eligible to make a Mark-to-Market Election with respect to the common shares, no such election may be made with respect to the shares of any Subsidiary PFIC that such U.S. Holder is treated as owning because such stock is not marketable. Hence, the Mark-to-Market Election will not be effective to eliminate the interest charge described above.

*Other PFIC Rules*

Under Section 1291(f) of the Code, the IRS has issued proposed Treasury Regulations that, subject to certain exceptions, would cause a U.S. Holder that had not made a timely QEF Election to recognize gain (but not loss) upon certain transfers of common shares that would otherwise be tax-deferred (such as gifts and exchanges pursuant to tax-deferred reorganizations under Section 368 of the Code). However, the specific

22

U.S. federal income tax consequences to a U.S. Holder may vary based on the manner in which common shares are transferred.

Certain additional adverse rules will apply with respect to a U.S. Holder if the Company is a PFIC, regardless of whether such U.S. Holder makes a QEF Election. For example under Section 1298(b)(6) of the Code, a U.S. Holder that uses common shares as security for a loan will, except as may be provided in Treasury Regulations, be treated as having made a taxable disposition of such common shares.

Special rules also apply to the amount of foreign tax credits that a U.S. Holder may claim on a distribution from a PFIC.

The PFIC rules are complex, and each U.S. Holder should consult its own tax advisor regarding the PFIC rules and how the PFIC rules may affect the U.S. federal income tax consequences of the acquisition, ownership, and disposition of common shares.

## CANADIAN FEDERAL INCOME TAX CONSIDERATIONS

In the opinion of Fasken Martineau DuMoulin LLP, counsel to the Company, and Stikeman Elliott LLP, counsel to the Underwriters, the following is, as of the date hereof, a summary of the principal Canadian federal income tax considerations generally applicable to the acquisition, holding and disposition of common shares by a purchaser who acquires common shares pursuant to this prospectus. This summary is applicable to a purchaser of common shares who, at all relevant times, for the purposes of the *Income Tax Act (Canada)* (the "Tax Act"), deals at arm's length with the Company and the Underwriters and is not affiliated with the Company or an Underwriter, and holds common shares as capital property (a "**Shareholder**"). Generally, the common shares will be considered to be capital property to a purchaser provided that the purchaser does not hold such common shares in the course of carrying on a business of buying and selling securities and has not acquired them in one or more transactions considered to be an adventure in the nature of trade. Common shares acquired by certain "financial institutions" (as defined in section 142.2 of the Tax Act) will generally not be held as capital property by such holders and will be subject to special "mark-to-market" rules contained in the tax act. This summary does not take into account these special rules and holders to which these special rules may be relevant should consult their own tax advisors.

This summary is based on the current provisions of the Tax Act and the regulations thereunder and counsels' understanding of the current administrative policies and assessing practices of the Canada Revenue Agency (the "**CRA**") made publicly available prior to the date hereof. It also takes into account all specific proposals to amend the Tax Act and regulations thereunder publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof. This summary does not otherwise take into account or anticipate any changes in law or in the administrative policies or assessing practices of the CRA, whether by legislative, governmental or judicial action or decision, nor does it take into account other federal or any provincial or foreign income tax legislation or considerations. There is no assurance that the proposed amendments will be enacted in the form proposed or at all.

**This summary is of a general nature only and is not intended to be legal or tax advice to any particular investor. Investors should consult their own tax advisors for advice with respect to the tax consequences of an investment in common shares, based on their particular circumstances.**

### Shareholders Resident in Canada

The following discussion applies to a Shareholder who, at all relevant times, for the purposes of the Tax Act, is resident or is deemed to be resident in Canada (a "**resident Shareholder**"). Certain resident Shareholders who might not otherwise be considered to hold their common shares as capital property may, in certain circumstances, be entitled to make an irrevocable election permitted by subsection 39(4) of the Tax Act to have the common shares and every other "Canadian security" (as defined in the Tax Act), owned by such resident shareholder in the taxation year of the election and in all subsequent taxation years deemed to be capital property

*Taxation of Dividends on common shares*

Dividends (including deemed dividends) received on the common shares by a resident Shareholder who is an individual (other than by certain trusts) will be included in the individual's income and will generally be

23

subject to the gross-up and dividend tax credit rules normally applicable to taxable dividends received from taxable Canadian corporations. A dividend will be eligible for the enhanced gross-up and dividend tax credit if the recipient receives written notice from the company designating the dividend as an "eligible dividend" within the meaning of the Tax Act. Taxable dividends received by an individual (and certain trusts) may give rise to alternative minimum tax under the Tax Act, depending on the individual's circumstances.

Dividends (including deemed dividends) received on the common shares by a resident Shareholder that is a corporation will be included in computing the corporation's income and will generally be deductible in computing the corporation's taxable income.

A resident Shareholder that is a "private corporation", as defined in the Tax Act, or any other corporation controlled by or for the benefit of an individual (other than a trust) or a related group of individuals (other than trusts), will generally be liable to pay a $33^1/_3\%$ refundable tax under Part IV of the Tax Act on dividends received (or deemed to be received) on the common shares to the extent such dividends are deductible in computing its taxable income.

*Disposition of common shares*

A resident Shareholder who disposes of or is deemed to dispose of common shares will generally realize a capital gain (or sustain a capital loss) to the extent that the resident Shareholder's proceeds of disposition, net of any costs of disposition, exceed (or are less than) the adjusted cost base of such shares to the resident Shareholder. If the resident Shareholder is a corporation, any capital loss arising on a disposition of a share may in certain circumstances be reduced by the amount of any dividends, including deemed dividends, which have been received on the share. Analogous rules may apply to a partnership or trust of which a corporation, partnership or trust is a member or beneficiary.

Generally, one-half of any capital gain realized by a resident Shareholder in a taxation year will be included in computing the resident Shareholder's income for such year (a "taxable capital gain"), and one-half of any capital loss realized by a resident Shareholder in a taxation year (an "allowable capital loss") may be deducted from the resident Shareholder's taxable capital gains realized in that year in accordance with the rules in the Tax Act. Allowable capital losses in excess of taxable capital gains may be carried back three years or carried forward and deducted in a subsequent year against taxable capital gains realized in such years in accordance with the rules in the Tax Act. Capital gains realized by an individual (and certain trusts) will be relevant in computing possible liability for the alternative minimum tax.

Corporations that are "Canadian-controlled private corporations" as defined in the Tax Act may be subject to an additional refundable $6^2/_3\%$ tax on their "aggregate investment income" (which is defined in the Tax Act to include an amount in respect of taxable capital gains but not dividends or deemed dividends deductible in computing taxable income).

**Shareholders Not Resident in Canada**

The following discussion applies to a Shareholder who at all relevant times for purposes of the Tax Act and any applicable income tax treaty or convention, is neither resident nor deemed to be resident in Canada, does not and is not deemed to use or hold the common shares in carrying on a business in Canada, and does not hold common shares as part of the business property of a permanent establishment in Canada or in connection with a fixed base in Canada (a **"non-resident Shareholder"**). In addition, this discussion does not apply to an insurer who carries on business in Canada and elsewhere or an authorized foreign bank (as defined in the Tax Act).

*Dividends*

Dividends paid or credited or deemed to be paid or credited on the common shares to a non-resident Shareholder will be subject to a Canadian non-resident withholding tax at a rate of 25%. Such non-resident withholding tax may be reduced by virtue of the provisions of an income tax treaty or convention between Canada and the country of which the non-resident Shareholder is a resident.

*Disposition of common shares*

A non-resident Shareholder will not be subject to tax under the Tax Act in respect of any capital gain realized by such shareholder on a disposition of common shares unless the common shares constitute "taxable

24

Canadian property" (as defined in the Tax Act) of the non-resident Shareholder at the time of disposition and the non-resident shareholder is not entitled to relief under an applicable income tax treaty or convention. As long as the common shares are listed on a prescribed stock exchange for the purposes of the Tax Act (which currently includes the TSX) at the time of disposition, the common shares generally will not constitute taxable Canadian property of a non-resident Shareholder, unless at any time during the 60-month period immediately preceding the disposition, the non-resident Shareholder, persons with whom the non-resident Shareholder did not deal at arm's length, or the non-resident Shareholder together with all such persons, owned 25% or more of the issued shares of any class or series of shares of the capital stock of the Company. A non-resident Shareholder will not be required to obtain a certificate from the Canadian tax authorities pursuant to the provisions of section 116 of the Tax Act in connection with a disposition of common shares if the common shares are listed on a prescribed stock exchange for the purposes of the Tax Act at the time of their disposition.

## USE OF PROCEEDS

The gross proceeds to be received by Gammon Lake from the sale of the Purchased Shares will be $200,000,000. The payment of the Underwriters' fee of $8,000,000 together with expenses of the Offering estimated at $1,000,000 will be paid from the general funds of the Company. The Company proposes to use the net proceeds from the sale of the Purchased Shares as follows:

| | | |
|---|---|---|
| Repayment of Indebtedness[1] | $ | 133,717,694 |
| General Corporate Purposes | $ | 58,282,306 |
| Total | $ | 192,000,000 |

(1)   On October 14, 2005 the Company obtained a credit facility with the Bank of Nova Scotia and Societe Generale (arranged by Scotia Capital Inc.). The facility, as amended, is secured and consists of a two-year revolving facility and a three year non-revolving facility. Interest is payable at an annual rate equal to the Prime Rate plus 1.25% or in the case of US dollar advances, LIBOR + 2.25%. See "General Development of the Business — Three Year History" in the Annual Information Form. As at April 9, 2007 the Company had drawn down approximately US$120,000,000 on the facility in order to fund capital costs incurred in the development of the Ocampo Project.

If the Over-Allotment Option is exercised in full, an aggregate 1,500,000 Over-Allotment Shares will be issued and the gross proceeds thereof will be $30,000,000. The Company intends to use the net additional funds of $28,800,000 (after payment of applicable Underwriting fees) for general corporate purposes.

Pending the uses described above, the Company intends to invest the net proceeds from this Offering in commercial or bank paper with terms of less than three months. The actual amount that the Company spends in connection with each of the intended use of proceeds may vary significantly from the amounts specified above, and will depend on a number of factors, including those listed under "Risk Factors".

## PLAN OF DISTRIBUTION

**The Offering**

Pursuant to an amended and restated underwriting agreement dated April 9, 2007, (the "Underwriting Agreement") between the Company and the Underwriters, the Company has agreed to issue and sell and the Underwriters have agreed to purchase, on or about April 24, 2007, or on such other date as may be agreed by the Company and the Underwriters, but not later than May 1, 2007, subject to compliance with all necessary legal requirements and to the terms and conditions contained in the Underwriting Agreement, the Purchased Shares at a price of $20.00 per Purchased Share for aggregate gross proceeds of $200,000,000, payable in cash to the Company against delivery of certificates representing the Purchased Shares. The obligations of the Underwriters under the Underwriting Agreement may be terminated upon the occurrence of certain stated events. The Underwriting Agreement provides that the obligations of the Underwriters to purchase the Purchased Shares are subject to approval of legal matters by counsel and to other conditions. The Underwriters are, however, obligated to take up and pay for all of the Purchased Shares if any of the Purchased Shares are purchased under the Underwriting Agreement. The offering price of the Purchased Shares offered hereby has been determined by negotiation between the Company and the Underwriters.

The Company has granted the Underwriters an Over-Allotment Option, which entitles the Underwriters to acquire at any time up to 30 days following the closing of the Offering at the issue price hereunder, up to an additional 1,500,000 Over-Allotment Shares. If the Over-Allotment Option is exercised in full, the total price to the public, Underwriters' fee and net proceeds (before deducting expenses of the Offering) to the Company will be $230,000,000, $9,200,000 and $220,800,000, respectively. This short form prospectus also qualifies the grant of the Over-Allotment Option and the distribution of the Over-Allotment Shares upon exercise of the Over-Allotment Option.

Pursuant to the Underwriting Agreement, Gammon Lake appointed the Underwriters to offer the Offered Shares to the public in all of the provinces of Canada. In consideration for the services to be performed by the Underwriters, Gammon Lake has agreed to pay to the Underwriters a fee equal to $0.80 for each Offered Share purchased by the Underwriters. The Company has also agreed to reimburse the Underwriters for their expenses incurred in connection with the Offering, including the fees of their Canadian and United States legal counsel. All fees and expenses payable to the Underwriters will be paid on account of services rendered in connection with the Offering and will be paid from the gross proceeds thereof.

The Company has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the U.S. Securities Act of 1933, as amended, and Canadian securities legislation in certain circumstances, or to contribute to payments the Underwriters may be required to make because of such liabilities.

This Offering is being made concurrently in Canada and the United States pursuant to the multi-jurisdictional disclosure system implemented by the Commissions and the United States. The Offered Shares will be offered in Canada and the United States through the Underwriters directly or through their U.S. or Canadian broker-dealer affiliates registered in each jurisdiction, as applicable. Subject to applicable law, the Underwriters may offer the Offered Shares outside of Canada and the United States.

The Underwriters reserve the right to offer selling group participation, in the normal course of the brokerage business, to selling groups of other licensed broker-dealers, brokers or investment dealers, who may or may not be offered part of the Underwriters' fee.

The Underwriters propose to offer the Purchased Shares initially at the public offering price set forth on the cover page of this short form prospectus. After the Underwriters have made reasonable efforts to sell all the Purchased Shares by this short form prospectus at such price, the offering price may be decreased, and further changed from time to time to an amount not greater than the offering price specified herein.

Pursuant to rules and policies of certain Commissions, the Underwriters may not, throughout the period of distribution under the Offering, bid for or purchase common shares for their own accounts or for accounts over which they exercise control or direction. The foregoing restriction is subject to certain exceptions, on the condition that the bid or purchase not be engaged in for the purpose of creating actual or apparent active trading in, or raising the price of, the common shares. These exceptions include a bid or purchase permitted under the Universal Market Integrity Rules for Canadian Marketplaces administered by Market Regulation Services Inc. relating to market stabilization and passive market making activities, and a bid or purchase made

26

for or on behalf of a customer where the order was not solicited during the period of distribution. Subject to the foregoing, the Underwriters may over-allot or effect transactions which stabilize or maintain the market price of the common shares at levels other than those which otherwise might prevail on the open market. Such transactions, if commenced, may be discontinued at any time.

The rules of the SEC may limit the ability of the Underwriters to bid for or purchase common shares before the distribution of common shares under the Offering is completed. However, the Underwriters may engage in the following activities in accordance with these rules:

- Stabilizing transactions permit bids to purchase common shares so long as the stabilizing bids do not exceed a specified maximum;

- Over-allotment transactions involve sales by the Underwriters of common shares in excess of the number of common shares the Underwriters are obligated to purchase, which creates a syndicate short position. The Underwriters may close out any short position by purchasing common shares in the open market; and

- Penalty bids permit the representatives to reclaim a selling concession from a syndicate member when the common shares originally sold by the syndicate member are purchased in a stabilizing or syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions, syndicate covering transactions and penalty bids may have the effect of preventing or mitigating a decline in the market price of the common shares, and may cause the price of the common shares to be higher than would otherwise exist in the open market absent such stabilizing activities. As a result, the price of the common shares may be higher than the price that might otherwise exist in the open market. These transactions may be effected on the AMEX, the TSX or otherwise and, if commenced, may be discontinued at any time.

The Company will apply to list the Offered Shares on the TSX and AMEX. Listing will be subject to the fulfillment of all the listing requirements of the TSX and AMEX.

**Additional Issuances**

The Company will not, without the prior written consent of the Underwriters, issue, authorize or agree to issue or approve for issuance any common shares or any securities convertible into or exchangeable for or exercisable to acquire common shares for the period commencing on April 9, 2007 and concluding 90 days following the closing of the Offering, except in conjunction with the grant or exercise of stock options and other similar issuances pursuant to the share incentive plan of the Company and other share compensation arrangements including those contained in employment agreements with officers of the Company.

**Offering in the United States**

The Company filed a registration statement on Form F-10 with the SEC pursuant to the multi-jurisdictional disclosure system to register the offering of the common shares in the United States. It is a condition of closing of the Offering that such registration statement will have been declared effective by the SEC.

## RELATIONSHIP BETWEEN THE COMPANY AND CERTAIN UNDERWRITERS

Scotia Capital Inc. is a wholly owned subsidiary of a Canadian chartered bank that is a lender to the Company under the Company's current credit facility. Consequently, the Company may be considered to be a connected issuer of Scotia Capital Inc. under applicable securities legislation.

The credit facility is described under "General Development of the Business — Three Year History" in the Annual Information Form. As at April 9, 2007 the Company had drawn down approximately US$120,000,000 on the facility in order to fund capital costs incurred in the development of the Ocampo Project. The facility is secured by a general personal property security interest in all of the personal property of the Company and Mexgold Resources Inc., a charge on the shares of the Company's subsidiaries, moveable hypothecs on the Company's property, a collateral bond, guarantees from the Company's principal subsidiaries Mexgold Resources Inc. and Gammon Lake Resources (Barbados) Inc. and a debenture from Gammon Lake Resources (Barbados) Inc. The Company is in material compliance with all material terms of the agreements governing the facility. The credit facility agreement was amended on March 29, 2007 to cure a technical breach of covenants

regarding fixed charge ratios at March 31, 2006, but the lender has not waived any material breach by the Company of those agreements since the facility was established. Neither the financial position of the Company nor the value of the security under facility has changed substantially and adversely since the indebtedness under the facility was incurred.

The decision to distribute the Purchased Shares and the determination of the terms of the distribution were made solely through negotiations among the Company and the Underwriters. None of the lenders under the credit facility had any involvement in such decision or determination, but have been advised of the issuance and the terms thereof.

It is expected that $133,717,694 of the proceeds of the Offering will be applied to pay down the amounts owing under the credit facility. As a consequence of the offering, Scotia Capital Inc. will receive its respective share of the Underwriters' fee. See "Plan of Distribution" and "Use of Proceeds".

## DESCRIPTION OF SECURITIES BEING DISTRIBUTED

The Company's authorized capital consists of an unlimited number of common shares without nominal or par value, an unlimited number of Class A preferred shares and an unlimited number of Class B preferred shares. A total of 105,094,466 common shares were issued and outstanding as at March 30, 2007. There are no Class A or Class B preferred shares currently outstanding.

Each common share ranks equally with all other common shares with respect to dissolution, liquidation or winding-up of the Company and payment of dividends. The holders of common shares are entitled to one vote for each share of record on all matters to be voted on by such holders and are entitled to receive pro rata such dividends as may be declared by the board of directors of the Company out of funds legally available therefor and to receive pro rata the remaining property of the Company on dissolution. The holders of common shares have no pre-emptive or conversion rights. The rights attaching to the common shares can only be modified by the affirmative vote of at least two-thirds of the votes cast at a meeting of shareholders called for that purpose.

## LEGAL MATTERS

Certain Canadian legal matters in connection with these Offering will be passed upon by Fasken Martineau DuMoulin LLP on behalf of the Company and by Stikeman Elliott LLP on behalf of the Underwriters. Certain U.S. legal matters in connection with the Offering will be passed upon by Dorsey & Whitney LLP on behalf of the Company and by White & Case LLP on behalf of the Underwriters. As of the date hereof, to the Company's knowledge, the partners and associates of such firms beneficially own, directly or indirectly, less than one percent of the securities of the Company.

## EXPERTS

Information of a scientific or technical nature relating to the Ocampo Project contained in this short form prospectus or contained in other documents incorporated by reference in this short form prospectus is based upon an independent technical report dated January 2006 prepared by Mintec Inc. or a feasibility study dated November 29, 2004 prepared by Kappes, Cassaday & Associates.

Technical information relating to the El Cubo Project contained in this short form prospectus or contained in other documents incorporated by reference is based upon an independent technical report dated May 31, 2006 prepared by Glenn R. Clark & Associates and L.R. Kilpatrick Associates Inc.

Technical information relating to the Guadalupe y Calvo property contained in this short form prospectus or contained in other documents incorporated by reference is based upon an independent technical report dated November 25, 2002 prepared by Pincock, Allen & Holt.

None of the above-noted persons or companies hold a registered or beneficial interest, direct or indirect, in any securities or other property of the Company and its associates and affiliates.

No expert named in this section and no director, officer or employee of such experts is or is expected to be elected, appointed or employed as a director, officer or employee of the Company or of any associate or affiliate of the Company.

28

## AUDITORS, TRANSFER AGENT AND REGISTRAR

The Company's current auditor is KPMG LLP, Chartered Accountants, at its principal office in the City of Halifax, Nova Scotia. Prior to November 4, 2005 the Company's auditor was Grant Thornton LLP, Chartered Accountants at its principal office in the City of Halifax, Nova Scotia. The auditor of Mexgold Resources Inc. was, prior to its acquisition by Gammon Lake in August 2006, McGovern, Hurley, Cunningham, LLP, Chartered Accountants at its principal office in the City of Toronto, Ontario. KPMG LLP and McGovern, Hurley, Cunningham, LLP have each advised the Company that it is independent of the Company within the rules of professional conduct of the Institute of Chartered Accountants of Nova Scotia or Ontario, as applicable. Grant Thornton LLP has advised the Company that it was, at the time of issuance of its audit report on September 10, 2005, independent of the Company within the rules of professional conduct of the Institute of Chartered Accountants of Nova Scotia. Grant Thornton LLP has also advised the Company that it is no longer independent of the Company.

The transfer agent and registrar for the common shares is Computershare Investor Services Inc. at its principal offices in the City of Montreal, Quebec.

## DOCUMENTS FILED AS PART OF THE REGISTRATION STATEMENT

The following documents have been or will be filed with the SEC as part of the registration statement of which this prospectus forms a part: (i) the documents referred to under the heading "Documents Incorporated by Reference"; (ii) the Underwriting Agreement; (iii) consent of Fasken Martineau DuMoulin LLP; (iv) consent of Dorsey & Whitney LLP; (v) consent of Stikeman Elliott LLP; (vi) consents of KPMG LLP; (vii) consent of Grant Thornton LLP; (viii) consent of McGovern Hurley Cunningham LLP; (ix) consent of Kappes, Cassiday & Associates; (x) consent of Mintec, Inc.; (xi) consent of Leonard R. Kilpatrick; (xii) consent of Pincock, Allen & Holt; (xiii) consent of Glenn R. Clark & Associates; and (xiv) powers of attorney from directors and officers of Gammon Lake.

## ADDITIONAL INFORMATION

The Company has filed with the SEC a registration statement on Form F-10 relating to the Common Shares. This prospectus, which constitutes a part of the registration statement, does not contain all of the information contained in the registration statement, certain items of which are contained in the exhibits to the registration statement as permitted by the rules and regulations of the SEC. Statements included or incorporated by reference in this prospectus about the contents of any contract, agreement or other documents referred to are not necessarily complete, and in each instance you should refer to the exhibits for a more complete description of the matter involved. Each such statement is qualified in its entirety by such reference.

The Company is subject to the information requirements of the U.S. Securities Exchange Act of 1934 (the "U.S. Exchange Act") and applicable Canadian securities legislation, and in accordance therewith files reports and other information with the SEC and with the securities regulators in Canada. Under a multi-jurisdictional disclosure system adopted by the United States, documents and other information that the Company files with the SEC may be prepared in accordance with the disclosure requirements of Canada, which are different from those of the United States. As a foreign private issuer, the Company is exempt from the rules under the U.S. Exchange Act prescribing the furnishing and content of proxy statements, and its officers, directors and principal shareholders are exempt from the reporting and shortswing profit recovery provisions contained in Section 16 of the U.S. Exchange Act. In addition, the Company is not required to publish financial statements as promptly as U.S. companies.

You may read and copy any document that the Company has filed with the SEC at the SEC's public reference rooms in Washington, D.C. and Chicago, Illinois. You may also obtain copies of those documents from the public reference room of the SEC at 100 F Street, N.E., Washington, D.C. 20549 by paying a fee. You should call the SEC at 1-800-SEC-0330 or access its website at www.sec.gov for further information about the public reference rooms. You may read and download some of the documents the Company has filed with the SEC's Electronic Data Gathering and Retrieval system at www.sec.gov. You may read and download any public document that the Company has filed with the Canadian securities regulatory authorities at www.sedar.com.

## ENFORCEABILITY OF CIVIL LIABILITIES

The Company is a corporation existing under the Companies Act (Quebec). Many of the Company's directors and officers, and some of the experts named in this prospectus, are residents of Canada or otherwise reside outside the United States, and all or a substantial portion of their assets, and a substantial portion of the Company's assets, are located outside the United States. The Company has appointed an agent for service of process in the United States, but it may be difficult for holders of Common Shares who reside in the United States to effect service within the United States upon those directors, officers and experts who are not residents of the United States. It may also be difficult for holders of Common Shares who reside in the United States to realize in the United States upon judgments of courts of the United States predicated upon the Company's civil liability and the civil liability of its directors, officers and experts under the United States federal securities laws. The Company has been advised by its Canadian counsel, Fasken Martineau DuMoulin LLP, that a judgment of a United States court predicated solely upon civil liability under United States federal securities laws would probably be enforceable in Canada if the United States court in which the judgment was obtained has a basis for jurisdiction in the matter that would be recognized by a Canadian court for the same purposes. The Company has also been advised by Fasken Martineau DuMoulin LLP, however, that there is substantial doubt whether an action could be brought in Canada in the first instance on the basis of liability predicated solely upon United States federal securities laws.

The Company filed with the SEC, concurrently with its registration statement on Form F-10 of which this prospectus is a part, an appointment of agent for service of process on Form F-X. Under the Form F-X, the Company appointed DL Services, Inc. as its agent for service of process in the United States in connection with any investigation or administrative proceeding conducted by the SEC, and any civil suit or action brought against or involving the Company in a United States court arising out of or related to or concerning the offering of the Common Shares under this prospectus.



TSX:GAM AMEX:GRS

## PART II

## INFORMATION NOT REQUIRED TO BE DELIVERED TO
## OFFEREES OR PURCHASERS

**INDEMNIFICATION**

The laws of Quebec and the Registrant's Articles permit indemnification of its directors and officers against certain liabilities, which would include liabilities arising under the Securities Act of 1933, as amended.

Sections 123.87, 123.88 and 123.89 of the Companies Act (Quebec), as amended, provide as follows:

123.87 [Defense] A company shall assume the defense of its mandatary prosecuted by a third person for an act done in the exercise of his duties and shall pay damages, if any, resulting from that act, unless the mandatary has committed a grievous offence or a personal offence separable from the exercise of his duties.

[Criminal Proceedings] However, in a penal or criminal proceeding the company shall assume only the payment of the expenses of its mandatary if he had reasonable grounds to believe that his conduct was in conformity with the law, or the payment of the expenses of its mandatary if he has been freed or acquitted.

123.88 [Expense] A company shall assume the expenses of its mandatary if, having prosecuted him for an act done in the exercise of his duties, it loses its case and the court so decides.

[Expenses] If the company wins its case only in part, the court may determine the amount of the expenses it shall assume.

123.89 [Obligations] A company shall assume the obligations contemplated in sections 123.87 and 123.88 in respect of any person who acted at its request as director for a legal person of which it is a shareholder or creditor.

The Bylaws of the Registrant provide that, subject to the limitations contained in the QCA, the Registrant shall indemnify a director or officer, a former director or officer, or a person who acts or acted at the Registrant's request as a director or officer of a body corporate of which the Registrant is or was a shareholder or creditor and his heirs and legal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made a party by reason of being or having been a director or officer of the Corporation or such body corporate, if:

(a)    he acted honestly and in good faith with a view to the best interests of the Registrant; and

(b)    in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, he had reasonable grounds for believing that his conduct was lawful.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Registrant pursuant to the foregoing provisions, the Registrant has been informed that in the opinion of the U.S. Securities and Exchange Commission (the "Commission") such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**EXHIBITS**

The exhibits to this Registration Statement are listed in the exhibit index which appears elsewhere herein.

## PART III

### UNDERTAKING AND CONSENT TO SERVICE OF PROCESS

**Item 1.    Undertaking**

The Registrant undertakes to make available, in person or by telephone, representatives to respond to inquiries made by the Commission staff, and to furnish promptly, when requested to do so by the Commission staff, information relating to the securities registered pursuant to Form F-10 or to transactions in said securities.

**Item 2.    Consent to Service of Process**

Concurrently with the filing of the Registration Statement on Form F-10, the Registrant is filing with the Commission a written irrevocable consent and power of attorney on Form F-X. Any change to the name or address of the agent for service of the Registrant shall be communicated promptly to the Commission by amendment to Form F-X referencing the file number of the relevant registration statement.

## SIGNATURES

Pursuant to the requirements of the Securities Act, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F-10 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the city of Halifax, Nova Scotia, Canada, on April 10, 2007.

**GAMMON LAKE RESOURCES INC.**

By:    /s/ Russell Barwick

Russell Barwick
Chief Executive Officer and Director

Pursuant to the requirements of the Securities Act, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Russell Barwick<br><br>Russell Barwick | Chief Executive Officer and Director (principal executive officer) | April 10, 2007 |
| /s/ Colin P. Sutherland<br><br>Colin P. Sutherland | Chief Financial Officer and Director (principal financial officer and principal accounting officer) | April 10, 2007 |
| *<br><br>Fred George | President and Chairman of the Board of Directors | April 10, 2007 |

| Signature | Title | Date |
|---|---|---|
| *<br>Alejandro Caraveo Vallina | Director | April 10, 2007 |
| *<br>Dale M. Hendrick | Director | April 10, 2007 |
| *<br>Kent L. Noseworthy | Director | April 10, 2007 |
| *<br>Frank Conte | Director | April 10, 2007 |
| *<br>Canek Rangel | Director | April 10, 2007 |
| * By:   /s/ Colin Sutherland<br>        Colin Sutherland | Attorney-in-fact | April 10, 2007 |

## AUTHORIZED REPRESENTATIVE

Pursuant to the requirements of Section 6(a) of the Securities Act, the undersigned has signed this Registration Statement, solely in the capacity of the duly authorized representative of Gammon Lake Resources Inc. in the United States on April 10, 2007.

/s/ Martin Pomerance

Martin Pomerance

## EXHIBIT INDEX

| Exhibit | Description |
|---|---|
| 4.1 | Annual Information Form of the Registrant dated March 29, 2007 (incorporated by reference to the Registrant's Annual Report on Form 40-F for the fiscal year ended December 31, 2006, filed with the Commission on April 3, 2007) |
| 4.2 | Audited comparative financial statements of the Registrant for the year ended December 31, 2006 together with the auditors' report thereon and the comments by auditors for U.S. readers on Canada-U.S. reporting differences (incorporated by reference to the Registrant's Annual Report on Form 40-F for the fiscal year ended December 31, 2006, filed with the Commission on April 3, 2007) |
| 4.3 | Management's Discussion and Analysis of Financial Condition and Results of Operations for the financial year ended December 31, 2006 (incorporated by reference to the Registrant's Annual Report on Form 40-F for the fiscal year ended December 31, 2006, filed with the Commission on April 3, 2007). |
| 4.4 | Reconciliation to U.S. GAAP of the Registrant's audited consolidated financial statements as at December 31, 2006 and 2005 and July 31, 2005 and for the years ended December 31, 2006, for the five months ended December 31, 2005 and the year ended July 31, 2005 (incorporated by reference from the Registrant's Annual report on Form 40-F for the fiscal year ended December 31, 2006, filed with the Commission on April 3, 2007) |
| 4.5 | Audited comparative restated financial statements of the Registrant for the five month period ended December 31, 2005 together with the auditors' report thereon, including a U.S. GAAP reconciliation (incorporated by reference to the Registrant's Annual Report on Form 40-F for the five month period ended December 31, 2005, filed with the Commission on April 3, 2007) |
| 4.6 | Management's Discussion and Analysis of Financial Condition and Results of Operations for the five month period ended December 31, 2005 (incorporated by reference to the Registrant's Annual Report on Form 40-F for the five month period ended December 31, 2005, filed with the Commission on March 31, 2006) |
| 4.7 | Audited comparative financial statements of the Registrant for the fiscal year ended July 31, 2005 together with the auditors' report thereon, including a U.S. GAAP reconciliation (incorporated by reference to the Registrant's Annual Report on Form 40-F for the year ended July 31, 2005, filed with the Commission on October 28, 2005) |
| 4.8 | Management's Discussion and Analysis of Financial Condition and Results of Operations for the fiscal year ended July 31, 2005 (incorporated by reference to the Registrant's Annual Report on Form 40-F for the year ended July 31, 2005, filed with the Commission on October 28, 2005) |
| 4.9 | Management proxy circular of the Registrant dated April 13, 2006 relating to the annual and special general meeting of the shareholders of the Registrant held on May 10, 2006 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 13, 2006) |
| 4.10 | Business acquisition report dated October 20, 2006 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on October 23, 2006) |

| Exhibit | Description |
|---------|-------------|
| 4.11 | Material change report dated January 11, 2007 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on January 11, 2007) |
| 4.12 | Material change report dated January 16, 2007 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on January 16, 2007) |
| 4.13 | Material change report dated January 22, 2007 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on January 22, 2007) |
| 4.14 | Material change report dated January 29, 2007 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on January 29, 2007) |
| 4.15 | Material change report dated April 2, 2007 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 3, 2007) |
| 4.16 | Material change report dated April 3, 2007 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 3, 2007) |
| 4.17 | Reconciliation to U.S. GAAP of the Registrant's audited consolidated financial statements as at December 31, 2006 and 2005 and July 31, 2005 and for the years ended December 31, 2006, the five months ended December 31, 2005 and the year ended July 31, 2005 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 9, 2007). |
| 4.18 | Reconciliation to U.S. GAAP of the audited consolidated financial statements of Mexgold Resources Inc. as at December 31, 2005 and April 30, 2005 and 2004 and for the eight month period ended December 31, 2005 and the years ended April 30, 2005 and 2004 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 9, 2007) |
| 4.19 | Reconciliation to U.S. GAAP of the interim unaudited consolidated financial statements of Mexgold Resources Inc. as at June 30, 2006 and for the six month period ended June 30, 2006 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 9, 2007) |
| 4.20 | Reconciliation to U.S. GAAP of the pro forma financial statements of the Registrant as at June 30, 2006 and for the six months ended June 30, 2006, the five months ended December 31, 2005 and the year ended July 31, 2005 (incorporated by reference from the Registrant's Form 6-K furnished to the Commission on April 9, 2007) |
| 5.1 | Consent of Fasken Martineau DuMoulin LLP* |
| 5.2 | Consent of Dorsey & Whitney LLP* |
| 5.3 | Consent of Stikeman Elliott LLP* |
| 5.4 | Consent of KPMG LLP, Independent Chartered Accountants |
| 5.5 | Consent of Grant Thornton LLP, Independent Chartered Accountants |
| 5.6 | Consent of McGovern Hurley Cunningham LLP, Independent Chartered Accountants |
| 5.7 | Consent of Kappes, Cassiday & Associates* |
| 5.8 | Consent of Mintec, Inc.* |
| 5.9 | Consent of Leonard R. Kilpatrick* |
| 5.10 | Consent of Pincock, Allen & Holt* |
| 5.11 | Consent of Glenn R. Clark & Associates* |
| 6.1 | Powers of Attorney |

\*        Previously filed

QuickLinks

PART I INFORMATION REQUIRED TO BE DELIVERED TO OFFEREES OR PURCHASERS
TABLE OF CONTENTS
ELIGIBILITY FOR INVESTMENT
DOCUMENTS INCORPORATED BY REFERENCE
SPECIAL NOTICE REGARDING FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION
THE COMPANY
BUSINESS OF THE COMPANY
CONSOLIDATED CAPITALIZATION
RISK FACTORS
U.S. FEDERAL INCOME TAX CONSIDERATIONS
CANADIAN FEDERAL INCOME TAX CONSIDERATIONS
USE OF PROCEEDS
PLAN OF DISTRIBUTION
RELATIONSHIP BETWEEN THE COMPANY AND CERTAIN UNDERWRITERS
DESCRIPTION OF SECURITIES BEING DISTRIBUTED
LEGAL MATTERS
EXPERTS
AUDITORS, TRANSFER AGENT AND REGISTRAR
DOCUMENTS FILED AS PART OF THE REGISTRATION STATEMENT
ADDITIONAL INFORMATION
ENFORCEABILITY OF CIVIL LIABILITIES
PART II INFORMATION NOT REQUIRED TO BE DELIVERED TO OFFEREES OR PURCHASERS
PART III UNDERTAKING AND CONSENT TO SERVICE OF PROCESS
SIGNATURES
AUTHORIZED REPRESENTATIVE
EXHIBIT INDEX