UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

MIDAS FUND, INC.

                              Plaintiff,

            - against -

GAMMON GOLD, INC., FRED GEORGE, BRADLEY
LANGILLE, RUSSELL BARWICK, COLIN
SUTHERLAND, BMO NESBITT BURNS INC.,
SCOTIA CAPITAL INC., and TD SECURITIES INC.

                              Defendants.

------------------------------------------------------------

Index No.    07 CV 6707 (NRB)

**MEMORANDUM OF LAW IN OPPOSITION TO ALL DEFENDANTS'
MOTIONS TO DISMISS**

GUZOV OFSINK, LLC
*Attorneys for Plaintiff*
*Midas Fund, Inc.*
600 Madison Avenue, 14th Floor
New York, NY 10022
(212) 371-8008

Of Counsel:
Debra J. Guzov (DG 7125)
David J. Kaplan (DK 0100)
Matthew M. Pek (not yet admitted)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. ..................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS.... ................................................................................................ 3

ARGUMENT ........................................................................................................................5

I.     The Legal Standard........................................................................................5

II.    Defendants' Representations Concerning Their Current Production Rate and Goals
       Are Not Forward-Looking Statements Protected By The PSLRA or the "Bespeaks
       Caution" Doctrine............................................................................................7

       A.     Knowing Misrepresentations Are Not Protected by Either the
              PSLRA Safe Harbor Or the "Bespeaks Caution" Doctrine..........7

       B.     Gammon's Statements Are Not "Forward-Looking" and
              Therefore Are Not Protected by the PSLRA Safe Harbor ......... 10

       C.     Gammon's Statements Were Not Accompanied by
              Meaningful Cautionary Statements, And Therefore Fall
              Outside the PSLRA Safe Harbor For This Reason As Well ...... 13

       D.     Gammon's Statements Are Not Protected by the "Bespeaks
              Caution" Doctrine.................................................................... 15

III.   Midas More Than Adequately Pleads that Gammon's Statements Concerning the
       Level of Production at the Ocampo Mine Were False When Made........................... 16

IV.    Plaintiff Adequately Pleads Motive and Opportunity to Commit Fraud and
       Therefore Has Adequately Plead Scienter................................................. 19

V.     Midas Has Alleged Loss Causation *via* a Corrective Disclosure and Subsequent
       Drop In Gammon's Share Price .................................................................23

VI.    Midas's State Law Claims Are Not Preempted, and Are Otherwise Adequately
       Pleaded ..................................................................................................24

VII.   Midas Should Be Permitted to Replead in the Event One or More of Its Claims
       Are Dismissed .........................................................................................25

CONCLUSION ..................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F.Supp. 1308 (S.D.N.Y. 1997)....11, 16

*Bell Atlantic Corp. v. Twombly,* __ U.S. __, 127 S.Ct. 1955 (2007).........................................6

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)....................................................6

*Cromer Fin. Ltd. v. Berger*, 2001 WL 1112548 (S.D.N.Y. 2001) ...........................................24

*Dura Pharm. v. Broudo,* 544 U.S. 336 (2005) ........................................................................23

*In re Adelphia Comm. Corp. Secs. And Deriv. Litig.*, 398 F. Supp.2d 244 (S.D.N.Y. 2005)..17

*In re Alliance Pharmaceutical Corp. Sec. Litig.*, 279 F.Supp.2d 171 (S.D.N.Y. 2003) ...........7

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
93 F.Supp.2d 424 (S.D.N.Y. 2000) ........................................................................................18

*In re APAC Teleservice, Inc. Sec. Litig.*, No. 1999 WL 1052004 (S.D.N.Y. 1999) .................8

*In re Ashanti Goldfields Sec. Litig.*, 184 F.Supp.2d 247 (E.D.N.Y. 2002) .......................11, 12

*In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314 (S.D.N.Y. 2001).........passim

*In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416 (S.D.N.Y. 2003).........................8, 13

*In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88 (S.D.N.Y. 2006) ..............13

*In re Hudson Tech. Secs. Litig.*, 1999 WL 767418 (S.D.N.Y. 1999)........................................20

*In re Initial Public Offering Sec. Litig.*, 358 F.Supp.2d 189 (S.D.N.Y. 2004).........................16

*In re Intern. Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ..................................9

*In re JP Morgan Chase Secs. Litig.,* 363 F. Supp.2d 595 (S.D.N.Y. 2005)..............................17

*In re Keyspan Corp. Secs. Litig.*, 2003 WL 21981806 (E.D.N.Y. 2003)...................................17

*In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613 (S.D.N.Y. 2003)..............8, 13, 16

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68 (S.D.N.Y.1996) ........15, 16

*In re Quintel Entm't. Inc. Sec. Litig.*, 72 F.Supp.2d 283 (S.D.N.Y. 1999) ..............................11

*In re Time Warner Secs. Litig.*, 9 F.3d 259 (2d Cir. 1993).......................................................20

*In re Twinlab Corp. Secs. Litig.*, 103 F. Supp.2d 193 (E.D.N.Y. 2000) ..................................20

*In re Van der Moolen Holding N.V. Secs. Litig.*,
405 F. Supp.2d 388 (S.D.N.Y. 2005) ............................................................................6, 18, 20

*In re Veeco Instruments Sec. Litig.* 235 F.R.D. 220 (S.D.N.Y. 2006) ..............................17, 18

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)........................................................................21

*Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221 (S.D.N.Y. 2006) ............................9

*Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005) ...................................................23

*Luce v. Edelstein,* 802 F.2d 49 (2d Cir. 1986).........................................................................25

*Manavazian v. Atec Group, Inc.*, 160 F. Supp.2d 468 (E.D.N.Y. 2001)....................................9

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)..................................................................passim

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)......................................................................20

*Rosenzweig v. Azuriz Corp.,* 332 F.3d 854 (5th Cir. 2003) ........................................................18

*Rothman v. Gregor,* 220 F.3d 81 (2d Cir. 2000) ......................................................................20

*Ruskin v. TIG Holdings, Inc.*, 2000 WL 1154278 (S.D.N.Y. 2000) ........................................15

*S.E.C. v. Meltzer*, 440 F.Supp.2d 179 (E.D.N.Y. 2006)...........................................................16

*Salinger v. Projectavision,* 934 F.Supp. 1402 (S.D.N.Y. 1996) ..............................................20

*Scalp & Blade, Inc. v. Advest, Inc.,* 281 A.D.2d 882, 722 N.Y.S.2d 639 (4th Dep't 2001) .....24

*See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576 (2d Cir. 1990).........12

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996).......................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S.Ct. 2499 (2007)....................19

*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375 (2d Cir. 1995) ..........................................6

**Statutes**

15 U.S.C. § 77j ............................................................................................... 16, 23

15 U.S.C. § 77k ...................................................................................................... 16

15 U.S.C. § 77z-2(c)(1) ............................................................................... 10, 13, 14

15 U.S.C. § 77z-2(c)(1)(A)(i) ................................................................................. 13

15 U.S.C. § 77z-2(c)(2)(B) ............................................................................... 14, 15

15 U.S.C. § 78u-4(b) ............................................................................................... 6

15 U.S.C. § 78u-4(b)(1) ......................................................................................... 17

15 U.S.C. § 78u-4(b)(2) ......................................................................................... 19

15 U.S.C. § 78u-5(c)(1) ............................................................................... 10, 13, 14

15 U.S.C. § 78u-5(c)(2)(B) ............................................................................... 14, 15

17 C.F.R. § 240.10b-5 ........................................................................................... 16

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 5

Fed. Rule Civ. P. 9(b) ........................................................................................ 6, 16

N.Y. Gen. Bus. L. § 350 ........................................................................................ 24

N.Y. Gen. Bus. L. §§ 349 ...................................................................................... 24

Plaintiff, Midas Fund, Inc. ("Midas" or "Plaintiff"), by and through its counsel, Guzov

Ofsink, LLC, respectfully submits this memorandum of law in opposition to the motion to

dismiss Midas's Second Amended Complaint and Demand for Jury Trial ("Complaint") filed

by defendants Gammon Gold, Inc. ("Gammon"), Fred George ("George"), Bradley Langille

("Langille"), Russell Barwick ("Barwick"), Colin Sutherland ("Sutherland") (George,

Langille, Barwick and Sutherland collectively referred to as "Individual Defendants"), and in

opposition to the motion to dismiss filed by defendants BMO Nesbitt Burns Inc. ("BMO"),

Scotia Capital Inc. ("Scotia") and TD Securities Inc. ("TD")(BMO, Scotia and TD

collectively referred to as "Underwriter Defendants").

## Preliminary Statement

Midas brings this action to redress the knowing and intentional fraud committed by

each of the Defendants.  Midas was induced to make a substantial equity investment in

Gammon because Gammon and the Individual Defendants repeatedly claimed that Gammon's

Ocampo mine was "fully commissioned" and that the company was "currently producing"

gold and other precious metals at an annualized run rate of 400,000 gold equivalent ounces.

However, Gammon's statements were known by Defendants to be false and fraudulent.  On

May 10, 2007, days after its CA$200 million financing was complete, Gammon changed its

story.  It now claimed it was only targeting a "production rate" of 400,000 gold equivalent

ounces in 2007, and had not even managed to reach this "rate" of production during its first

quarter.  When this news became public, the company's share price plummeted to

approximately 50% of the offering price.  Even as they were taking in the investors' money,

all Defendants had access to information demonstrating that the Company's actual production

was falling below its targets, yet they consciously withheld this data and never corrected their prior false forecasts.

While all Defendants claim that these staggering allegations do not create a cause of action under the federal securities laws, their arguments are without merit and their motions to dismiss must be denied. Defendants claim the benefit of the safe harbor for "forward-looking statements" contained in the Private Securities Litigation Reform Act (hereafter "PSLRA") as well as the common-law "bespeaks caution" doctrine, but neither of these doctrines applies to statements which are knowingly false when made, or statements which are not in actuality forward-looking. Midas also states facts sufficient to establish that Defendants' statements were false, in that the Complaint alleges (i) that Defendants made false statements concerning actual and planned production, (ii) that Defendants took affirmative steps to hide disclosure of the company's true production level until after the April 2007 offering, and (iii) that the company's actual production fell well short of Defendants' earlier projections, missing by such a wide margin as to virtually mandate a finding of fraud. Defendants' remaining arguments fare no better: Midas has sufficiently pleaded loss causation and scienter, and its state law claims are not preempted or otherwise subject to dismissal.

For all of these reasons, Defendants' motions must be denied, or, at a minimum, Midas should be permitted to replead its claims to cure any deficiencies in pleading identified by the Court. In this regard, all Defendants make much of the fact that Midas has purportedly had two prior opportunities to amend its pleading. As Defendants are well aware, this is not accurate: Midas first amended its complaint as of right a mere eleven days after its first filing in order to tighten its factual allegations. Midas's second amendment to its complaint did little more than add the Individual Defendants and Underwriter Defendants as parties, without

2

any substantial change to Midas's theory of the case or factual allegations. Given these facts, Defendants' contention is disingenuous in the extreme, and should be read to indicate the overall weakness of their position.

### Statement of Facts

The pertinent facts in this action are set forth at length and in detail in Midas's Complaint, and in the interest of brevity will not be repeated at length herein. For the Court's convenience, however, Midas submits the following chart to summarize the chronology of Defendants' initial misrepresented projections, the completion of Gammon's public offering, and the subsequent disclosure that the initial projections were false:

| January 2007 | Gammon announces that its Ocampo mine is fully commissioned (*i.e.*, it achieved its mine plan and intended production rate) | Complaint ¶ 32. |
|---|---|---|
| January 11, 2007 | **Gammon announces that it "is currently producing at an annualized production run rate of 400,000 gold equivalent ounces …"** | *Id.* ¶ 33. |
| January 16, 22, 29, 2007 | Gammon repeatedly announces that it is "on schedule to produce in excess of 400,000 gold equivalent ounces … per year" | *Id.* ¶¶ 34, 35. |
| February 26, 2007 | Gammon President Fred George announces to potential investors at the 16th Annual Resources Conference that Gammon was on schedule to produce 400,000 gold equivalent ounces. Written materials are distributed that proclaim that the company expects "full production of more than 400,000 gold equivalent ounces" for the year 2007. | *Id.* ¶¶ 36-37. |
| March 28, 2007 | Gammon maintains that it is" targeting production of 400,000 gold equivalent ounces … in 2007." | *Id.* ¶ 38. |
| April 2, 2007 | Gammon announces a positive 2006 cash flow and maintains that it is "targeting production of 400,000 gold equivalent ounces … in 2007." | *Id.* ¶ 39. |

3

| April 3, 2007 | Gammon maintains that it is "targeting production of 400,000 gold equivalent ounces … in 2007." | *Id.*, ¶ 40. |
| April 9, 2007 | Gammon begins to market its stock offering to potential investors with materials (Registration Statement and Short-Form Prospectus) incorporating many of the above public statements. | *Id.*, ¶ 41-45. |
| April 24, 2007 | Gammon completes its equity financing (*i.e.*, it takes in $200 million Canadian from Midas and other investors). | *Id.*, ¶ 49. |
| May 10-11, 2007 | Gammon publicly admits that it is not on target to produce 400,000 gold equivalent ounces and admits that the mines are not producing at the rate that the company had heralded since January 2007.<br><br>**Gammon stock plummets, and Plaintiff Midas suffers a loss of almost $4 million.** | *Id.*, ¶¶ 56-57, 65. |
| August 3, 2007 | Fred George admits to media that Gammon had experienced a production shortfall due to "unexpected equipment problems," but does not explain why the information was not made public while production was dwindling.[1] | *Id.*, ¶ 68. |

Further, several aspects of Midas's allegations have been overlooked (perhaps intentionally) or minimized in the briefs submitted by Defendants.[2] First, all Defendants fail to acknowledge the critical impact of Gammon's change in position in May 2007. In particular, on May 10, 2007 Gammon issued a press release in which it retreated from prior claims that it was "on schedule" or "targeting" production of 400,000 "gold equivalent ounces" for 2007. Complaint, ¶ 56. Instead, Gammon claimed, without explanation or elaboration, that it was "targeting a production **rate** of 400,000 gold equivalent ounces" for

---

[1] The Court may refer to the actual text of many of these press releases by consulting the exhibits annexed to the Declaration of John Rock (the "Rock Declaration") submitted by Gammon in support of its motion.

[2] Citations to the Memorandum of Law in Support of Gammon Gold, Inc.'s and the Individual Defendants' Motion to Dismiss the Second Amended Complaint will be in the form "Gammon Brief at p. __", while citations to the Memorandum of Law in Support of the Motion of Defendants BMO Nesbitt Burns Inc., Scotia Capital Inc. and TD Securities Inc. to Dismiss the Second Amended Complaint will be in the form "Underwriters' Brief at p. __."

the year. *Id.* The addition of the single word "rate" drastically changes the content of this disclosure: where Gammon had previously been stating that it was producing a certain total volume of precious metal in 2007, it was now only affirming that it would eventually operate at the *rate* needed to produce that total volume. As a result, Gammon's May 10 disclosure caused a calamitous drop in the price of Gammon's shares which directly resulted in Midas's damages. *Id.*, ¶ 65.

Second, this Court can take judicial notice that Gammon's overall production continued to plummet well below its early optimistic projections. For example, annexed as Exhibit A to the Declaration of David J. Kaplan (the "Kaplan Declaration") is a press release issued by Gammon Gold on November 12, 2007, in which Gammon admits that its overall production for the third quarter of 2007 amounted to only 47,091 gold equivalent ounces. Annualized, this amounts to only 188,364 gold equivalent ounces, less than half of Gammon's initial projection of 400,000 gold equivalent ounces for 2007, which the company repeatedly touted to investors between January and April. *See* Complaint, ¶¶ 32-40. A subsequent press release announced that Gammon's fourth quarter production was only slightly better, amounting to 48,124 gold equivalent ounces (or annualized, 192,496 gold equivalent ounces). *See* Kaplan Decl. Exh. B. No matter how thickly they may have layered their statements with cautionary language, Defendants simply cannot spin these facts in a positive light or evade liability for their misrepresentations.

## Argument

### I.    The Legal Standard

The legal standards governing Defendants' motions are well settled. In evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept "all factual

allegations in the complaint as true, and [draw] all reasonable inferences in the plaintiff's favor." *In re Van der Moolen Holding N.V. Secs. Litig.*, 405 F. Supp.2d 388, 396 (S.D.N.Y. 2005) (*quoting Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (*quoting Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)) (internal quotation omitted). Under the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly,* __ U.S. __, 127 S.Ct. 1955 (2007), Midas must now provide this Court with a level of factual detail sufficient "to raise a right to relief above the speculative level." *Id.* at 1965.[3]

Defendants note that these liberal pleading standards are modified in the securities fraud context by Federal Rule of Civil Procedure 9(b), as well as the PSLRA, 15 U.S.C. 78u-4(b). However, Rule 9(b) does not require Midas to plead an evidentiary level of detail at this early stage of the litigation. *See Van der Moolen*, 405 F. Supp.2d at 397 (noting that "[c]ourts of this district have stated that the application of Rule 9(b) . . . must not abrogate the concept of notice pleading") (citation and internal quotation omitted); *see also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996) ("in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence"), *superseded by statute on other grounds*, 15 U.S.C. 78u-(4)(b)(1)-(2).

---

[3] Much as Midas would prefer to simply concur with Gammon's formulation of the pleading standard, *see* Gammon Brief at p. 8, *Bell Atlantic* teaches that the "no set of facts" standard has been abrogated. *See Bell Atlantic*, 127 S.Ct. at 1969.

II.     **Defendants' Representations Concerning Their Current Production Rate and Goals Are Not Forward-Looking Statements Protected By The PSLRA or the "Bespeaks Caution" Doctrine**

Midas will respond to Defendants' arguments concerning the PSLRA and the "bespeaks caution" doctrine as follows:  point A below will demonstrate that neither doctrine applies to Defendants' knowing misrepresentations, points B and C will demonstrate that the PSLRA safe harbor does not apply because Defendants' statements were not "forward-looking" or accompanied by adequate cautionary language, and point D will show that the "bespeaks caution doctrine" is unavailing where, as here, Defendants' cautionary language was cursory and embraced risks which had already occurred.

A.      <u>Knowing Misrepresentations Are Not Protected by Either the PSLRA Safe Harbor Or the "Bespeaks Caution" Doctrine</u>

Gammon's knowing fraud precludes its reliance on the PSLRA safe harbor or the "bespeaks caution" doctrine, despite Defendants' arguments to the contrary.  *See* Gammon Brief at p. 8.  Midas has adequately alleged with the requisite particularity that <u>Defendants made material misrepresentations</u> concerning the mines' production rates <u>that were known to be false at the time they were made</u>.  *See* Complaint, ¶¶ 32, 35, 48, 51, 67, 70, 75, 76, 81. Thus, even assuming, *arguendo*, that Gammon's statements were in fact "forward-looking statements" accompanied by "meaningful cautionary language," Defendants' arguments fail in light of the well-settled rule that "<u>neither the bespeaks caution doctrine nor the Safe Harbor provision of the PSLRA protects a defendant from liability if a statement was knowingly false when made</u>."  *In re Alliance Pharmaceutical Corp. Sec. Litig.*, 279 F.Supp.2d 171, 192 (S.D.N.Y. 2003) (emphasis added) (citation omitted); *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 340 (S.D.N.Y. 2001) (<u>Buchwald, J.</u>) (denying motion to dismiss federal securities claims and holding "[t]he 'bespeaks caution' doctrine and the related

statutory 'safe harbor' provision of the PSLRA [] [were] inapplicable … [t]hose doctrines apply to forward-looking statements *only*, and not to material omissions or misstatements of historical fact") (internal citation omitted) (emphasis in original); *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 628 (S.D.N.Y. 2003) ("[n]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made") (citation omitted).[4]

These authorities are dispositive in this case, where Plaintiff repeatedly alleged that Defendants made the misrepresentations regarding the company's production rates at a time when they were known to be false. *See* Complaint, ¶¶ 35, 70, 76, 81. Plaintiff also specifically alleged how and why the statements were knowingly false when made: Defendants knew the actual production rates, but failed to disclose them. *See, e.g.*, *id.*, ¶¶ 61, 66, 77, 103. On this point, there can be no serious question. Defendants were well aware, during the first quarter of 2007, that Gammon's production was falling short of the repeatedly touted figure of 400,000 gold equivalent ounces. Annualizing the first quarter's actual results, Gammon was scheduled to produce approximately 280,000 gold equivalent ounces in 2007 – far short of its target. *See id.*, ¶ 64. As noted above, Gammon's actual production for subsequent quarters deteriorated even further. *See* Kaplan Decl. Exhs A, B. Contrasting these actual results with Gammon's prior assertions, such as its January 11, 2007 press release where it boasted that it is "<u>currently producing</u> at an annualized production run rate of 400,000 gold equivalent ounces," Complaint, ¶ 33 (emphasis added), can lead to only one

---

[4] *See also In re APAC Teleservice, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999) ("[l]inking future success to present and past performance does not render statements immune from liability"); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (<u>Buchwald, J.</u>), 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) (acknowledging that liability may attach where a forward-looking statement was made with knowledge of falsity or misrepresents present facts).

conclusion – that Defendants intentionally concealed poor interim numbers until after the closing of their April 2007 public offering.

Plaintiffs have even alleged a concrete example of such concealment in the Complaint. Prior to January 2007, Gammon issued monthly reports on its production levels, but abruptly ceased this practice in January 2007. *Id.*, ¶ 61. Considering the stark 30% discrepancy between the actual and reported rates of production at the end of Gammon's first quarter, and given their decision to stop issuing monthly reports, Defendants cannot have reasonably believed that their exaggerated production forecasts during the quarter were accurate. In this regard, the severe disparity between the actual and forecasted rates of production does not permit an inference of optimism on the part of the Defendants. However, even if Defendants were merely making "optimistic projections" or "puffery," it is well-settled that "optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (*i.e.*, the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty." *Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 239 (S.D.N.Y. 2006) (emphasis added) (*citing In re Intern. Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("[s]tatements regarding projections of future performance may be actionable … if the speaker does not genuinely or reasonably believe them" at the time they were made) (emphasis added)); *Manavazian v. Atec Group, Inc.*, 160 F. Supp.2d 468, 480-81 (E.D.N.Y. 2001) (characterization of company's financial health and future performance as "on track," when speakers were aware of information undermining that conclusion, was more than mere optimism or puffery).

Finally, it is worth noting that Defendant George, on behalf of Gammon, admitted in August 2007 that Gammon had in fact experienced a production shortfall due to "unexpected equipment problems," Complaint, ¶ 68, but never explained why it had failed to disclose the problems to investors, or why the company never disavowed any of its prior statements that it was "targeting" or "scheduling" production of 400,000 gold equivalent ounces.  This fact only further demonstrates the cover-up which all Defendants undertook.

Accordingly, because Plaintiffs have concretely and adequately alleged that Defendants' misrepresentations and omissions were knowing and willful, Defendants are precluded from availing themselves of the safe harbor of the PSLRA or the "bespeaks caution" doctrine.  *See, e.g.*, *Complete Mgmt.*, 153 F.Supp.2d at 340.

> B.     <u>Gammon's Statements Are Not "Forward-Looking" and Therefore Are Not Protected by the PSLRA Safe Harbor</u>

As Defendants observe, under the PSLRA's safe harbor provision, a "forward-looking" statement will not be actionable if it is identified as such and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1); 15 U.S.C. § 77z-2(c)(1).  However, despite Defendants' generalized allegations to the contrary, Gammon's statements are by no means "forward-looking."  Rather, as alleged in the Complaint, the entirety of Gammon's false statements either directly describe Gammon's <u>current</u> production rate or provide a definitive projection of the its annualized output that is based upon <u>current</u> production rates.

On this point, precedent clearly dictates that statements which refer to a company's current situation cannot be considered forward-looking.  *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (in case involving misrepresentations concerning defendant's failure to

10

mark down unsold inventory in an effort to bolster its financial results, where defendants made statements that inventory was "in good shape" or "under control," Second Circuit held that "defendants may be liable for misrepresentations of existing fact" where "the complaint allege[s] that the defendants did more than just offer rosy predictions" but made statements when they allegedly knew that the contrary was true); *In re Ashanti Goldfields Sec. Litig.*, 184 F.Supp.2d 247, 267 (E.D.N.Y. 2002) (*citing In re Quintel Entm't. Inc. Sec. Litig.*, 72 F.Supp.2d 283, 292-93 (S.D.N.Y. 1999) (internal quotation omitted)); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F.Supp. 1308, 1324 (S.D.N.Y. 1997)). The facts in *Ashanti* are instructive. In that case plaintiffs alleged that defendant, a gold mining company, was utilizing a program of investment in gold-linked futures and derivatives to engage in speculation, not hedging; that is, rather than using its futures positions to guard against drops in the price of gold, defendant was making bets on the market and deriving income from them. *Ashanti*, 184 F. Supp.2d at 253. In that context, the Court noted that defendants' statements were not, in context, forward-looking, even though they related to the potential effect of the derivative portfolio on future events, because they also necessarily implicated the then-existing state of the portfolio's positions and existing investment strategy. *Id.* at 266-67.[5]

Gammon's statements in this case have the same implication of current status as those at issue in *Ashanti*. For example, in its January 11, 2007 press release, Gammon announced that it is "<u>currently producing</u> at an annualized run rate of 400,000 gold equivalent ounces." Complaint, ¶ 33 (emphasis added). Under no rule of grammatical construction can this phrase

---

[5] Similarly, in *Complete Management*, plaintiffs alleged that defendant overstated its financial results by failing to create reserves for doubtful receivables, even though it was aware that such receivables might not be collectible. *Complete Mgmt.*, 153 F. Supp.2d at 319. The Court held that these statements were not "forward-looking" because they dealt with historical facts, *i.e.* the current status and collectibility of the company's receivables, not future events. *Id.* at 340.

be considered "forward-looking":  this can be clearly seen from Gammon's use of the phrase

"currently producing," while the phrase "annualized run rate of 400,000" represents an

extrapolation which must be premised upon a <u>current rate of production</u>.  Similarly,

Gammon's post-January 11, 2007 production-related statements, which employ phrases such

as "on schedule" or "on target to produce 400,000 gold equivalent ounces," are likewise based

upon a <u>current rate of production</u>.  These statements are not, as Defendants allege, statements

of the "plans and objectives" for "future operations," Gammon Brief at p. 10, but rather were

specific quantifications based upon then-existing production rates.

     Defendants attempt to rely on cases outside the Second Circuit which note that

statements whose truth cannot be ascertained until some time after the time they are made are

"forward-looking."  *See id.*  However, even these cases fail to rescue the statements at issue,

for the truth of the statement, "on schedule to produce in excess of 400,000 gold equivalent

ounces in 2007" is <u>presently ascertainable</u>:  the statement describes a current rate of

production that, when extrapolated, provides the basis for the "400,000 gold equivalent

ounces in 2007" projection.  As in *Ashanti*, Plaintiff "ha[s] been quite clear that [it is] seeking

liability for misleading statements concerning what the [current state] of the company *was*.

Such statements about the then-existing state of affairs are not protected by the safe harbor

provision [of the PSLRA]."  *Ashanti*, 184 F.Supp.2d at 267 (emphasis in original) (*citing In re*

*Quintel*, 72 F.Supp.2d at 292-93) (internal quotation omitted).[6]

---

[6] Moreover, misleading statements must be evaluated in light of the "total mix" of information available to investors.  *See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (with respect to disclosures concerning right to tender debentures, issue was not whether individual statements concerning tender rights were true, but whether "representations, taken together and in context, would have mislead a reasonable investor"; court found that disclosures as a whole misrepresented efficacy of tender right).  Thus, the post-January 11, 2007 statements should be considered as closely following and necessarily dependent upon the January 11, 2007 statement itself, so that the post-January 11, 2007 statements are actionable even if viewed as "future projections."

Accordingly, Gammon's January through April 2007 statements were clearly not "forward-looking" but instead were statements of Gammon's "then-existing" rate of production, and are thus not protected by the safe harbor provision of the PSLRA.  *See, e.g.*, *Ashanti*, 184 F.Supp.2d at 267.

        C.      <u>Gammon's Statements Were Not Accompanied by Meaningful Cautionary Statements, And Therefore Fall Outside the PSLRA Safe Harbor For This Reason As Well</u>

Even if Gammon's statements were "forward-looking" – which they clearly were not – none of Gammon's statements was accompanied by "meaningful cautionary statements," as required by the safe harbor provision of the PSLRA.  15 U.S.C. § 78u-5(c)(1); 15 U.S.C. § 77z-2(c)(1).  As this Court has previously recognized, the PSLRA "provides a safe harbor exception for situations where statements have been accompanied by <u>adequate</u> cautionary language."  *In re Duane Reade*, 2003 WL 22801416, at *5 (<u>Buchwald, J.</u>) (emphasis added) (*citing* 15 U.S.C. § 77z-2(c)(1)(A)(i)).  "To be meaningful [under the safe harbor of the PSLRA], cautionary language must precisely address the substance of the specific statement or omission that is challenged."  *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88, 102 (S.D.N.Y. 2006) (*citing In re Nortel*, 238 F.Supp.2d at 628).  As discussed below, none of Gammon's statements, whether in its press releases, public statements or the registration statement for its April 2007 public offering (hereafter "Registration Statement"), was accompanied by meaningful cautionary language.

With respect to its press releases, Gammon's alleged "cautionary statement," is ineffective and content-free.  The "cautionary statement" below each press release contains only boilerplate language disclosing the most generalized risk factors:

> … Important factors that could cause actual results to differ
> materially from [Gammon's] expectations include, among

13

> others, risks related to international operations, the actual results
> of current exploration activities, conclusions of economic
> evaluations and changes in project parameters as plans continue
> to be refined as well as future prices of gold and silver, as well
> as those factors discussed in the section entitled "Risk Factors"
> in [Gammon's] Form 40-F and Annual Information Form as
> filed with the [SEC]. …

Rock Decl. Exhs. 1-4, 7-10, 12-15.    Accordingly, Gammon's press releases were not

"accompanied by meaningful cautionary statements," as required by the safe harbor provision

of the PSLRA.  15 U.S.C. § 78u-5(c)(1); 15 U.S.C. § 77z-2(c)(1).[7]

Defendants' oral statements fare even worse.  In its February 26, 2007 presentation to

investors at the annual BMO Capital Markets conference, defendant Fred George on behalf of

Gammon once again announced that Gammon was "on schedule to produce [400,000 gold

equivalent ounces] in the calendar year 2007."  Complaint, ¶ 36.  Here, however, Gammon

does not even claim to have provided any "cautionary statement" for its oral announcement,

much less a meaningful one.  Importantly, the PSLRA outlines a special rule for oral

statements, providing a safe harbor only if the statement includes "that the actual results could

differ materially from those projected in the forward-looking statement" and in addition,

refers the listener to a readily-available written document which contains appropriate

cautionary language.  15 U.S.C. § 77z-2(c)(2)(B); 15 U.S.C. § 78u-5(c)(2)(B).  Gammon's

oral statement fails this test on all fronts.  Not only did George fail to state that "the actual

results could differ materially from those projected in the forward-looking statement," he also

failed to identify or otherwise reference what, if any, readily available written document did

---

[7] Notably, at page 13 of the Gammon Brief, Defendants mischaracterize the nature of the alleged "cautionary language" accompanying fraudulent statements by manipulating and paraphrasing separately occurring risk disclosures and reciting them as if they constitute a single cautionary statement.  In particular, the language "risks related to international operations, including . . . limited local infrastructure to support large scale mining operations" takes statements which appear in two different documents which reference each other and makes it appear, via use of the ellipsis, as if the language appears in the form quoted, which it does not.  We can only assume that this was an inadvertent error given Defendants' heavy reliance on the text of their disclosure documents.

14

"contain the additional information about those factors relating to the forward-looking statement." *See* 15 U.S.C. § 77z-2(c)(2)(B); 15 U.S.C. § 78u-5(c)(2)(B). Defendants never mention this fact in their moving papers or attempt to rescue this oral statement in any fashion.

Finally, Defendants place heavy reliance on the disclosure language contained in the Registration Statement, which does contain a somewhat-more detailed set of disclosures. Defendants fail to appreciate, however, that Gammon's failure to meet its production targets <u>must have already occurred and been ongoing</u> by April 10, 2007. Defendants certainly cite no authority for the proposition that a cautionary statement can immunize them from liability for a risk which had <u>actually come to pass</u> before the statement was made, and in fact there is none. As one court put it, "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068 (LLS), 2000 WL 1154278, at *7 (S.D.N.Y. 2000); *see also In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996) ("[t]he doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"). For all of these reasons, Defendants cannot rely on cautionary language to avail themselves of the PSLRA safe harbor.

D.    <u>Gammon's Statements Are Not Protected by the "Bespeaks Caution" Doctrine</u>

Defendants seek to invoke the protection of the common law "bespeaks caution" doctrine. *See* Gammon Brief at p. 8. However, even if their knowing misstatements did not already disqualify them from reliance on this doctrine (which they do), the same deficiencies

15

in Defendants' cautionary language which removes their statements from the PSLRA safe harbor also prevents Defendants from relying on this doctrine.

Under the "bespeaks caution" doctrine, cautionary language "<u>must precisely address the substance of the specific statement</u> or omission that is challenged" in order to render the statement immaterial.  *In re Nortel*, 238 F.Supp.2d at 628 (*citing Prudential*, 930 F.Supp. at 72).  Indeed, "generalized disclosures of amorphous risks will not shield defendants from liability; instead, the cautionary language must be specific and factual and expressly warn of or directly relate to the forward-looking statements in question."  *S.E.C. v. Meltzer*, 440 F.Supp.2d 179, 191 (E.D.N.Y. 2006) (*citing In re Initial Public Offering Sec. Litig.*, 358 F.Supp.2d 189, 211-12 (S.D.N.Y. 2004)); *see also ABF Capital*, 957 F.Supp. at 1324 ("[i]nclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading") (citation omitted).

Here, for the reasons discussed above in connection with the PSLRA, Defendants' cautionary language is devoid of the specific and factual disclosures required by the courts, and plainly fails to warn of the specific risks that actually materialized.  Moreover, it bears repeating that no amount of cautionary language can obviate the failure to disclose a risk which had already occurred, *see Prudential, supra*, at 72, and by the time Gammon had released its Annual Information Form on April 10, 2007 it had already experienced a significant production shortfall in its first quarter.  For all these reasons, Defendants cannot rely upon the "bespeaks caution" doctrine here.

### III.    Midas More Than Adequately Pleads That Gammon's Statements Concerning The Level of Production At the Ocampo Mine Were False When Made

Defendants correctly note that Midas's Rule 10b-5 and Section 11 and 12(a)(2) claims are subject to the heightened pleading requirements contained in Fed. R. Civ. P. 9(b)**Error!**

**Bookmark not defined.** and the PSLRA, which require that Midas specifically identify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *In re Veeco Instruments Sec. Litig.* 235 F.R.D. 220, 227 (S.D.N.Y. 2006) (*quoting* 15 U.S.C. § 78u-4(b)(1)). Although Defendants do appear to concede that Midas has identified which statements it believes were fraudulent, when they were made, and who made them, *see* Gammon Brief at p. 15, they nevertheless accuse Midas of failing to allege "facts" indicating that Gammon's repeated statements concerning production levels at Ocampo were false when made. *Id.* at 15-16. Defendants are wrong: cases in this District regularly approve of pleadings which allege that defendants in a securities fraud action made false statements to the public when they knew that the facts were otherwise. *See Veeco*, 235 F.R.D. at 228 (allegation that defendants led investors to conclude that product profitability improvements could be made, while defendants knew such improvements were impossible, adequately alleged why statements were false); *In re Adelphia Comm. Corp. Secs. And Deriv. Litig.*, 398 F. Supp.2d 244, 251-52 (S.D.N.Y. 2005) (allegations that defendants intentionally inflated new customer counts in press releases, when they knew that actual line counts were much lower, adequately alleged why statements were false); *In re Keyspan Corp. Secs. Litig.*, No. 01 CV 5852 (ARR), 2003 WL 21981806, at *12 (E.D.N.Y. July 30, 2003) (allegation that defendants continued to issue glowing public statements despite knowledge of project difficulties and serious cash flow problems at company adequately alleged why statements were false).[8]

---

[8] Defendants' authorities are not to the contrary, as the language they cite from *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp.2d 595 (S.D.N.Y. 2005) and *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), actually discusses the standard required for pleading scienter *via* allegations of reckless conduct, not falsity. *See, e.g., Novak,* 216 F.3d at 309 ("[a]t the same time, however, we have identified several important limitations on the scope of liability for securities fraud based on reckless conduct. First, we have refused to allow plaintiffs to proceed with allegations of fraud by hindsight.").

In this action, Midas has alleged exactly the sort of knowingly false statements approved in *Veeco, supra*, and similar cases. As discussed at length in Point IA of this brief, Midas has alleged that Defendants knew Gammon's production target could not be met, but continued the false claims that the company would be able to do so. Complaint, ¶¶ 35, 70, 76, 81. Midas can directly allege that Defendants' interim statements were false because (i) Gammon and the Individual Defendants took affirmative steps to hide the true production figures from the public by ceasing their monthly reporting, *id.*, ¶¶ 61-62, (ii) Gammon missed its target in the first quarter by a substantial amount, *id.*, ¶¶ 58, 63, and (iii) Gammon admitted that "equipment" problems were hampering production in August, 2007, well after the closing of their Public Offering. *Id.*, ¶ 68. At this early stage of the litigation, and bearing in mind that Midas need not plead evidentiary facts to survive Defendants' motions, *see Van der Moolen*, 405 F. Supp.2d at 397, the allegations of falsity are more than sufficient.

Defendants' attempt to claim that its post-January 2007 statements amounted to non-actionable "puffery" also fails. Statements concerning Gammon's current production level and current target for annual production are specific statements concerning the company's actual operation, and therefore not mere "sales talk" or "puffery." *See In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 443 (S.D.N.Y. 2000) (statements concerning company's current value were not "generalized, optimistic statements about the future," but statements concerning the company's present state); *see also In re Nortel*, 238 F.Supp.2d at 627 ("[s]tatements regarding projections of future performance may be actionable under 10(b) or Rule 10b-5 if they are worded as guarantees <u>or are supported by specific statements of fact</u>") (emphasis added) (citation omitted). Defendants' reliance on *Rosenzweig v. Azuriz Corp.,* 332 F.3d 854 (5th Cir. 2003) is misplaced, since in that case the

18

plaintiffs apparently failed to allege that the sixty "targeted" projects were not viable – here,

Midas has clearly alleged that Gammon's 2007 production target was not viable.  For these

reasons, Defendants' cannot succeed in their challenge to Midas's pleading of falsity.[9]

## IV.  Plaintiff Adequately Pleads Motive and Opportunity to Commit Fraud and Therefore Has Adequately Plead Scienter

Defendants note that the PSLRA requires Midas to allege "with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."

Gammon Brief at p. 17 (*quoting* 15 U.S.C. § 78u-4(b)(2)).  Midas can satisfy this standard by

alleging (1) facts showing that Defendants had both motive and opportunity to commit fraud,

or (2) facts amounting to strong circumstantial evidence of intentional behavior or

recklessness.  *See, e.g., Novak*, 216 F.3d at 315.  In addition, *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, __ U.S. __, 127 S.Ct. 2499, 2510 (2007) requires that any inference of fraud be

at least as plausible as other non-wrongful explanations for events.  Defendants, however, err

when they claim that Midas's Complaint fails to meet this standard.

Midas has clearly alleged that "Defendant Gammon's misrepresentations concerning

its 2007 production were made for the sole purpose of inducing reliance by investors in

purchasing common shares in the April 2007 public offering."  Complaint, ¶ 52.  Midas also

clearly alleges that the Individual Defendants either personally executed the

misrepresentations or ratified them after they were made.  *Id.*, ¶ 48.  Gammon and the

Individual Defendants thus had a clear "motive" to commit fraud:  to ensure the success of

Gammon's April Public Offering.  Because Gammon chose to price its shares at $20 apiece, it

---

[9] Gammon's meager challenge to Midas's pleading of detrimental reliance at page 16 of its brief does not require extended discussion, as Midas has clearly alleged that it relied on each of Defendants' misrepresentations, including the January 11, 2007 statement Gammon discusses.  *E.g.,* Complaint ¶¶ 48, 70.

had every incentive, as did the Individual Defendants, to make sure that Gammon's financial results supported this valuation.

Thus, and contrary to Defendants' argument, Defendants' fraudulent scheme was not merely done generally "to maintain the appearance of corporate profitability," Gammon Brief at p. 18, but to execute a specific transaction rendering a concrete benefit to Gammon and the Individual Defendants. Both the Second Circuit and courts in this District have held that similar allegations satisfy the standard for pleading scienter. *See Rothman v. Gregor,* 220 F.3d 81, 93-94 (2d Cir. 2000) (allegation that defendant intended to use stock to purchase target company made it "strongly inferable" that defendant took steps to artificially inflate its stock price); *Van der Moolen*, 405 F.Supp.2d at 411 (plan to grow company through acquisition made using company stock).[10] This holding has been extended by both the Second Circuit and this District to allow plaintiffs to allege that defendants manipulated stock prices to facilitate a public offering or financing transaction. *See In re Time Warner Secs. Litig.*, 9 F.3d 259, 269-70 (2d Cir. 1993) (drawing all inferences in plaintiffs' favor, complaint adequately stated scienter element by alleging that prior misrepresentations were intended to maintain high stock price prior to announcement of offering in effort to reduce dilutive effect of offering).[11]

The authorities cited by Defendants are not to the contrary, as neither *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) nor *Salinger v. Projectavision,* 934 F.Supp. 1402 (S.D.N.Y. 1996) involved allegations that defendants were contemplating a specific corporate

---

[10] *See also Complete Mgmt.*, 153 F.Supp.2d at 328 (Buchwald, J.) ("[h]owever, the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement."); *In re Hudson Tech. Secs. Litig.*, No. 98 CIV. 1616 (JGK), 1999 WL 767418, at *10 (S.D.N.Y. Sept. 28, 1999) (plan to acquire two companies with stock provided defendants with motive to artificially inflate stock price).

[11] *See also American Bank Note*, 93 F.Supp.2d at 445 (subsidiary whose shares were offered in IPO transaction obtained a tangible benefit from IPO in its increased ability to borrow on its own credit, and therefore had motive to inflate share price prior to IPO); *In re Twinlab Corp. Secs. Litig.*, 103 F. Supp.2d 193 (E.D.N.Y. 2000) (corporation's interest in maximizing revenue from public offering gave it motive to commit fraud).

transaction, while *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) primarily discussed

individual defendants who were alleged to have profited *via* insider sales. Thus, scienter has

clearly been alleged with respect to Defendant Gammon. Moreover, contrary to Defendants'

argument on page 19 of the Gammon Brief, similar motives have been held sufficient as

against officers and directors of a corporation, as in the present case. *See, e.g., Complete*

*Mgmt.*, *supra,* at 324-328.

Midas has also established scienter under the alternate prong available to it, namely by

demonstrating a strong inference of conscious behavior or recklessness. In a case Defendants

themselves rely heavily upon, the Second Circuit held that such an inference could be created

by, *inter alia,* allegations that defendants "knew facts or had access to information suggesting

that their public statements were not accurate . . . or (4) failed to check information they had a

duty to monitor." *Novak*, 216 F.3d at 311. Midas's Complaint contains precisely these

allegations:

> 60. That is, Defendant Gammon knew or certainly should have known at the time
> it conducted its public offering in April 2007 that its production was well below its
> alleged scheduled production of 400,000 gold equivalent ounces.

> 61. Indeed, prior to January 2007, Defendant Gammon issued monthly reports on
> its production levels, and it is beyond doubt that it knew the accurate production rate
> of its mines at the time it made its public offering.

> 62. In a January 11, 2007 press release, Defendant Gammon announced that
> because the Ocampo mine had become fully commissioned, it would "provide
> production updates in the company's quarterly Financial Statements, Management
> Discussions and Analysis."

>                                    * * *

> 66. At the time that Defendant Gammon made its repeated and public
> misrepresentations, all of the information necessary to determine its actual rate of
> production (*i.e.*, the actual take from the ore processed in the first quarter of 2007) was
> in its possession.

> 67. Therefore, it is beyond doubt that the misrepresentations and omissions
> presented to Plaintiff and to the public at large were false at the time that they were
> made and were made to induce Midas and other reasonable investors to misjudge the

21

value of common shares of Gammon.

In other words, Gammon clearly had access to its actual production levels: this is indisputable fact, and not mere inference on Midas's part, because those actual production levels were disseminated to the public on a monthly basis prior to January 2007. Complaint, ¶ 61. Midas also pleads that the Individual Defendants were each aware of Gammon's actual rate of production, *id.*, ¶ 77, and, as a matter of law, the Individual Defendants were required to monitor this information in the course of their duties. *See Complete Mgmt., supra,* at 325 ("making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation"). Further, no one disputes that Gammon's first quarter numbers fell well below the company's earlier projections and that its subsequent performance was even worse. *See* Kaplan Decl. Exhs. A, B (noting third and fourth quarter production results were each less than 50,000 gold equivalent ounces). The fact that the Individual Defendants caused Gammon to withhold its monthly production numbers from the public[12] and continued to make false statements concerning Gammon's operations during the first four months of 2007, shows (1) that the Individual Defendants failed to check information to which they had access, and (2) had access to information suggesting that their public statements were inaccurate, as required by the Second Circuit in *Novak.* Therefore, Midas has clearly alleged both "motive and opportunity" and conscious wrongdoing, and its scienter allegations are more than adequate.

---

[12] For this reason, Defendants' argument that Midas "fails to allege that contemporaneous reports even existed," Gammon Brief at p. 20, misses the point entirely. Of course Midas cannot so allege: its entire argument is that Gammon and the Individual Defendants ceased issuing such reports in an effort to withhold damaging news from the market.

**V.**    **Midas Has Alleged Loss Causation *Via* a Corrective Disclosure and Subsequent Drop In Gammon's Share Price**

Oddly, Defendants claim that Midas has failed to allege the element of loss causation, citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005) for the proposition that Midas must allege that the materialization of a "known risk" proximately caused Midas's injury.  However, *Lentell* itself acknowledges that loss causation can be alleged by claiming that the price of stock fell in response to a disclosure correcting a defendant's prior misrepresentations.  *Id.* at 175; *see also Dura Pharm. v. Broudo,* 544 U.S. 336 (2005).  Midas has made precisely this allegation:  after describing Gammon's quarterly report and May 11, 2007 conference call, during which Gammon admitted that it was far from meeting its previously announced production target, *see* Complaint, ¶¶ 56-58, 63, Midas states as follows: "After the release of the first quarterly report and after the May 11, 2007 conference call, the price for Gammon stock fell dramatically, which resulted in Midas's loss of millions of dollars."  *Id.*, ¶ 65.  Defendants do not argue that any intervening market phenomenon caused Midas's loss; in the absence of such an argument, their challenge to Midas's pleading of loss causation must fail.[13]

**VI.**    **Midas's State Law Claims Are Not Preempted, And Are Otherwise Adequately Pleaded**

Finally, Defendants' attempt to secure dismissal of Midas's state law claims falls short.  First, Midas's common law fraud claim succeeds for the same reasons that its Rule 10b-5 claim succeeds, as discussed at length above.

---

[13] Defendants' final arguments with respect to Midas's claims under Sections 12(a)(2) and 20(a) need not be extensively discussed.  Midas's Section 12(a)(2) claim against all Defendants seeks damages, not rescission, because Midas disposed of the Gammon shares it purchased in April 2007 shortly before it filed the Complaint. A copy of the trade confirmation concerning this sale is annexed to the Kaplan Declaration as Exhibit C. Therefore, Midas could not have sought rescission, or tendered its shares to Gammon, and the Complaint cannot be dismissed based on Midas's failure to do so.  With respect to Section 20(a), Defendants make no objection to Midas's control person claims beyond denying that Midas has adequately alleged a primary securities law violation.  Since, as set forth at length above, Midas does in fact state claims under Rule 10b-5 and Section 11 and 12 of the Securities Act, Midas's control person claims are not in fact subject to dismissal.

Defendants' next argument, that Midas's common law claims other than fraud are preempted by the Martin Act, is not supported by any controlling authority. However, although Defendants buttress this argument by citation to several cases from this district, Gammon Brief, at p. 23, they are unable to cite any New York Court of Appeals case which so holds, and other authorities take a different view. *See Cromer Fin. Ltd. v. Berger*, No. 00 CIV 2498 (Cote, J.), 2001 WL 1112548, at *3-4, (S.D.N.Y. Sept. 19, 2001); *Scalp & Blade, Inc. v. Advest, Inc.,* 281 A.D.2d 882, 722 N.Y.S.2d 639, 640-41 (4th Dep't 2001). As the Court noted in *Cromer,* "there is nothing in [previously cited Court of Appeals cases] or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action," *Cromer, supra*, at *4, and there is no textual support in the Martin Act for a distinction between common law fraud, which has been held not to be preempted, *see, e.g., Horn v. 440 East 57th Co.*, 151 A.D.2d 112, 547 N.Y.S.2d 1 (1st Dep't 1989), and claims such as negligent misrepresentation. *See Cromer, supra*, at *4. The existence of decisions taking a different view does not bar this Court from following the better-reasoned results in *Cromer* and *Scalp & Blade*.

Midas's claims pursuant to N.Y. Gen. Bus. L. §§ 349 and 350 are not subject to dismissal, because both of these statutes can be applied in the investment context. *See Scalp & Blade*, *supra*, at 884, 772 N.Y.S.2d at 640-641. As above, the existence of other authority to the contrary does not bar this Court from following *Scalp & Blade*.

## VII.    Midas Should Be Permitted to Replead In The Event One or More of Its Claims Are Dismissed

In the event this Court elects to dismiss some portion of Midas's claims, Midas respectfully requests an opportunity to replead its claims and cure any defects identified by the Court. In this regard, it is settled that dismissals for failure to plead fraud with

particularity are "almost always" granted with leave to amend. *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986). Defendants will no doubt oppose this request on the ground that Midas has already had two opportunities to amend, but this Court can take notice, based on its own docket, that Midas's first amendment was done as of right, less than two weeks after the filing of its initial Complaint, and for the sole purpose of adjusting its factual allegations. Even its second amendment, which resulted in the filing of the operative Complaint, did little more than add the Individual Defendants and Underwriter Defendants prior to any answer or motion. Given these facts, allowing Midas a third opportunity to amend is both warranted and justified.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the entry of an order denying Defendants' motions to dismiss in all respects.

Dated:  New York, New York
       January 25, 2008

Respectfully submitted


GUZOV OFSINK, LLC

By:  _____/s/ Debra J. Guzov___
     Debra J. Guzov (DG 7125)
     David J. Kaplan (DK 0100)
*Attorneys for Plaintiff*
*Midas Fund, Inc.*
600 Madison Avenue, 14th Floor
New York, NY 10022
(212) 371-8008

Of Counsel:
Matthew A. Pek (not yet admitted)